STATE OF CONNECTICUT *v.* VICTOR SMALLS
(AC 33885)

DiPentima, C. J., and Bear and Bishop, Js.

Argued March 5—officially released June 12, 2012

*Raymond L. Durelli*, special public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, was *David I. Cohen*, state's attorney, and *James Bernardi*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Victor Smalls, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that the court improperly (1) found that there was probable cause to support the prosecution of the defendant for causing the death of the victim, Edgar Sanchez, and (2) concluded that the evidence was sufficient to sustain the defendant's conviction for murder as either a principal or accessory. We affirm the judgment of the trial court.

The jury reasonably could have found the following detailed facts. On the afternoon of March 22, 2007, Colonel Francis, James Gibson and the victim drove to the vicinity of the Monterey Village housing project, which also is known as the Carlton Court housing project (apartment complex), in Norwalk. They parked their vehicle near the apartment complex, and Gibson went to sell narcotics, while the victim and Francis went to a nearby diner to wait for Gibson. When Gibson arrived at the diner, he told Francis and the victim that he thought something was going on outside and that they should leave the area. As they were walking back to

their vehicle, Gibson noticed two hooded and masked individuals, later identified as Jimmy Kave and the defendant, following them, and he told the victim and Francis to walk faster. One of the hooded and masked individuals called out to the men, and Francis looked back and saw one of the men reach toward his waistline. Believing that the man was about to pull out a gun, Francis turned and ran toward the vehicle. The victim turned around to face the hooded and masked men, and the defendant and Kave both fired several shots at the victim, one of which hit him, causing his death. Gibson turned and saw both the defendant and Kave firing handguns. The defendant and Kave fled the scene after firing the shots. Francis heard the gunshots and then heard Gibson yelling for him to get the car. Francis got the car and parked it near the victim, who was located at or near the entrance to the apartment complex on Grove Street, and he and Francis attempted to get the victim into the car, but the victim collapsed. Gibson applied pressure to the victim's wound, while he and Francis waited for the police and an ambulance to arrive.

Moments earlier, a resident of the apartment complex, Tracie McElveen (T. McElveen), along with her twin sister, Stacie McElveen (S. McElveen), drove down Grove Street, where they saw three males walking toward the apartment complex, and drove into the parking area of the apartment complex shortly before they heard gunfire. They then saw two males wearing hoodies[1] run from Grove Street and between buildings twelve and thirteen of the apartment complex, with their hoods clenched tight around their faces. T. McElveen then saw the men run into building thirteen of the apartment complex. As the McElveens drove away from

---

[1] A hoodie is defined as "a hooded sweatshirt." Merriam-Webster Online Dictionary, available at http://www.merriam-webster.com/dictionary/hoodie (last visited May 7, 2012).

the apartment complex, they saw the victim lying on his back, with blood all over him, and they stopped their car. T. McElveen recognized the injured male as one of the three males she and her sister had seen walking toward the apartment complex a short time before. The other two males they had seen were nearby, and one of them asked for someone to call 911. S. McElveen then called 911 using her cell phone. The McElveens remained at the scene and spoke with the police once they arrived at the scene.

A maintenance worker at the apartment complex, Temestocles Sanchez (T. Sanchez), had been repairing a hole in the wall in building thirteen when he heard the gunshots. After hearing the gunshots, he looked out of the window and saw the defendant and Kave run into the building less than a minute after he heard the shots. T. Sanchez recognized the defendant, and he also saw that the other individual had a partially exposed gun in his hoodie. The defendant and Kave began knocking on apartment doors. T. Sanchez went to report the incident to his supervisor, and they telephoned the police.

The defendant and Kave gained entry into apartment 151, and they began talking with its occupants, Erica Sawyer and her cousin, Crystal Burden. Burden, Burden's mother, Maribel Rodriguez, and Burden's younger sister all lived in apartment 151. Once Burden's mother left for work and Burden's younger sister left for school in the morning, Burden and Sawyer were the only people in apartment 151 until the defendant and Kave arrived. Burden and Sawyer had not left the apartment all day. After the defendant and Kave arrived, they each removed their sneakers and their hoodies. Burden told the defendant and Kave to leave, but they remained. The police arrived at the scene and surrounded building thirteen; no one entered or exited the building, except for the police. The police obtained a master key from

the manager of the apartment complex, secured the approval of the apartment residents and began knocking on doors looking for the defendant and Kave. Upon entering apartment 151, the police ordered its occupants to come out, and Sawyer and Burden exited a bedroom. An officer again ordered anyone else in the apartment to come out. The defendant and Kave came out of the bedroom from which Burden and Sawyer also exited. No one else was found in the apartment. The renter of the apartment, Maribel Rodriguez, arrived home, and the police obtained her permission to search the apartment. They found two hoodies, two pairs of men's sneakers and, in the back of the bedroom closet, a .380 semiautomatic handgun and a nine millimeter Glock handgun. In the cartridge of the Glock handgun were four Federal Cartridge Company (Federal) Hydra-Shok[2] brand nine millimeter bullets. The police also uncovered a black mask in a pocket of one of the hoodies and another black mask in one of the defendant's pockets.

In the meantime, the police had arrived at the location of the shooting and attempted to tend to the unconscious victim. An ambulance was called, and it transported the victim to the hospital, where he was pronounced dead, never having regained consciousness. The paramedic explained that the victim had "bled . . . out right on the street. He lost most of his blood there." The medical examiner reported that the twenty-two year old victim had died as a result of a "[g]unshot wound to the lower abdomen." The medical examiner retrieved one bullet from the victim's body, which, after cleaning and photographing it, she placed in a labeled container and then turned it over to the police. The

---

[2] We note that the transcripts of the probable cause hearing and the trial incorrectly refer to these as "hyrdroshock" brand bullets. See http://www.federalpremium.com/hunters_education/handgun_bullet_details.aspx (last visited May 7, 2012).

bullet was a nine millimeter caliber, jacket hollow point, with a Hydra-Shok design.

While at the scene of the shooting, the police collected eight spent shell casings and one live round. Four of the shell casings were .380 caliber, as was the one live round. The remaining shell casings were nine millimeter. It was determined, to a reasonable degree of certainty, that the shell casings had come from the handguns that had been seized from apartment 151. The bullet that killed the victim also was consistent with one having been fired from the nine millimeter handgun that was recovered from apartment 151. None of the shell casings or the handguns contained fingerprints, and the defendant and Kave had no gunpowder residue on their hands.

Following a probable cause hearing, the defendant elected to be tried by a jury, and a trial ensued. At the close of the state's evidence, the defendant filed a motion for a judgment of acquittal, which the court denied. The defendant called no witnesses. The jury found the defendant guilty of murder and of carrying a pistol without a permit. The court sentenced him to a total effective sentence of forty-five years imprisonment. This appeal followed.

I

We first must consider the defendant's claim that the court improperly concluded that the evidence was sufficient to sustain the defendant's conviction for murder as either a principal or an accessory. See *State* v. *Munoz*, 233 Conn. 106, 110, 659 A.2d 683 (1995) ("[w]e first consider the defendant's claim that the evidence was insufficient to convict him of murder, because if that claim is meritorious, all of his other claims are moot"). The defendant argues that there clearly was no evidence to support his conviction for murder as a principal because there was no evidence that he ever

touched the handgun from which the fatal shot was fired. He also argues that there was no evidence to support his conviction for murder as an accessory because there was no proof that he intentionally aided another person, pursuant to General Statutes § 53a-8 (a), in the commission of the murder.[3] The state argues that under the concert of action doctrine, the evidence was sufficient to sustain the defendant's conviction for murder as a principal or an accessory.[4] We agree with the state.

"Whether a person who is present at the commission of a crime aids or abets its commission depends on the circumstances surrounding his presence there and his conduct while there. . . . Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [murder] charged or did some act [that] forms . . . a part thereof . . . then the convictions must stand. . . . Therefore, as we have stated in the past, the terms accessory and principal refer to the alternate means by which one substantive crime may

[3] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[4] During oral argument before this court, the defendant asked that we look only to the plain words of § 53a-8 (a) in considering his claim, and that we not look to the concert of action cases decided by our Supreme Court, which, he claims, put a gloss on the statute that is not supported by the statute's plain language. Because we are bound by the precedent set by our Supreme Court, however, we are not at liberty to ignore those cases. "As an intermediate appellate court . . . we are not at liberty to overrule, reevaluate or reexamine controlling precedent of our Supreme Court. See *Stuart* v. *Stuart*, 297 Conn. 26, 45–46, 996 A.2d 259 (2010) ('it is manifest to our hierarchical judicial system that [the Supreme Court] has the final say on matters of Connecticut law and that the Appellate Court and Superior Court are bound by [its] precedent')." *Pite* v. *Pite*, 135 Conn. App. 819, 826–27, 43 A.3d 229 (2012).

be committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 622, 725 A.2d 306 (1999).

The defendant claims that the evidence was insufficient to support his conviction for murder as a principal or an accessory. He argues that there was no evidence that he fired the fatal shot that caused the death of the victim or that he intended to aid Kave in firing the fatal shot. We disagree. The defendant's claim is similar to a claim made in the *Delgado* case, in which the defendant had argued, inter alia, that to support his conviction for murder under an accessory theory, the state was required to prove that the defendant "intended to aid [the other participant] in the commission of murder . . . ." Id. In considering that claim, our Supreme Court explained: "[T]he jury reasonably could have inferred that, at the time that the defendant was firing the thirteen rounds at the victim, he was aware that [the other participant] also was shooting at the victim. Although the evidence did not reveal whether it was the defendant or [the other participant] who had fired the shot that fatally injured the victim, the jury reasonably could have determined that there was sufficient concert of action between the defendant and [the other participant] to support the accessory allegation. . . . As such, there was sufficient evidence to support the jury's conclusion that the defendant had intentionally contributed to the victim's murder." (Citation omitted.) Id., 623; see *State* v. *Diaz*, 237 Conn. 518, 544, 679 A.2d 902 (1996); see also *State* v. *Ashe*, 74 Conn. App. 511, 519–20, 812 A.2d 194, cert. denied, 262 Conn. 949, 817 A.2d 108 (2003). The facts of the present case fit squarely within the *Delgado* analysis.

In the present case, the jury reasonably could have found that, at the time the defendant was firing the four rounds at the victim, he was aware that Kave also was firing at the victim. Although the evidence did not reveal

whether it was the defendant or Kave who had fired the shot that fatally wounded the victim, the jury reasonably could have determined that there was sufficient concert of action between the defendant and Kave to support the accessory allegation. See *State* v. *Delgado*, supra, 247 Conn. 623. As such, there was sufficient evidence to support the jury's conclusion that the defendant intentionally contributed to the victim's murder. See id. Accordingly, the evidence was sufficient to support the defendant's conviction for murder as a principal or an accessory.

## II

Before proceeding to trial in this case, the state had been required to establish probable cause to believe that the defendant was guilty of intentional murder in violation of § 53a-54a, the elements of which are intent, causation, and death by killing. See *State* v. *Rasmussen*, 225 Conn. 55, 74, 621 A.2d 728 (1993). At the time of the probable cause hearing, the defendant had not been charged as an accessory, but only as a principal. The defendant claims that the court improperly found that the evidence was sufficient to support a finding of probable cause that he caused the death of the victim. Specifically, he argues that "the evidence submitted at [the] probable cause hearing was insufficient to establish that he fired the shot that mortally wounded [the victim]" and, therefore, that the court was without jurisdiction to hear the state's case against him. The state argues that "the evidence offered at the hearing in probable cause would certainly warrant a person of reasonable caution to believe that the [defendant] had committed the charged offense of the murder of [the victim]." We agree with the state.

On August 30, 2007, the court conducted a hearing to determine if there was probable cause that the defendant had committed the crime of murder in violation

of § 53a-54a. At the conclusion of the hearing, the court reasonably could have found the following facts. On March 22, 2007, T. McElveen, a tenant at the apartment complex, was returning to her home, accompanied by her sister, S. McElveen, to check her mailbox. As T. McElveen drove toward the apartment complex, she and her sister saw three men walking up Grove Street. After T. McElveen parked her car and went to check her mailbox, she heard several gunshots, causing her to "fr[eeze] in [her] tracks . . . ." S. McElveen also heard the gunshots. The McElveens then saw two people wearing black hoodies run between buildings twelve and thirteen of the apartment complex. T. McElveen saw those people enter building thirteen. She then saw a maintenance worker exit the building. She and her sister returned to the car and drove down Grove Street, where they saw the victim, whom T. McElveen identified as one of the three men she had seen earlier, lying on the ground on his back with "blood all over him." The other two men who had been walking with the victim were standing over him, and one of those men asked if someone would call 911. S. McElveen telephoned 911 from her cell phone, and she and her sister remained at the scene until the police arrived.

A maintenance worker at the apartment complex, T. Sanchez, also heard gunshots and looked out of a window in building thirteen to see what was happening. He saw two people running from Grove Street into building thirteen; he recognized one of those people to be the defendant, whom he recognized as a tenant or former tenant of the apartment complex. He noticed that the other man had a handgun. Both of these men began to knock on apartment doors in building thirteen. T. Sanchez left building thirteen and reported the incident to his supervisor. He also contacted the police.

Officer Alan Mocciola of the Norwalk police department was dispatched to Grove Street to investigate a

possible shooting. Upon his arrival, he noticed the victim on the ground near a gray vehicle with the right rear door partially opened. The victim was bleeding from the pelvis area, and Mocciola applied pressure to the wound as he called for an ambulance. The victim was not conscious. Several other officers and detectives arrived on the scene, and the scene was secured with yellow police tape. The ambulance arrived, and the victim was transported to a hospital where he was pronounced dead.

Sergeant John Lysobey and Officer Susan Holland of the Norwalk police department were dispatched to building thirteen, where they searched, inter alia, apartment 151. Holland opened the door to apartment 151 with a key that had been obtained from building management, and she ordered the occupants of the apartment to exit. Sawyer and Burden came out of a bedroom, and Holland asked them if anyone else was present in the apartment, to which they responded in the affirmative. Holland then ordered everyone else in the apartment to come out, and the defendant and Kave also exited the bedroom. The officers then searched apartment 151 and discovered a .380 caliber handgun and a nine millimeter handgun in the closet of the bedroom from which Sawyer, Burden, Kave and the defendant had exited. No one else was present in apartment 151. Following the defendant's arrest, he tested negative for gunshot residue on his hands, and testing of the handguns revealed no identifiable latent fingerprint impressions.

A search of the immediate area of the shooting revealed eight spent shell casings and one live round on the ground. Four of the shell casings were nine millimeter casings, four were .380 caliber casings and the live round also was a .380 caliber round. In addition, four live nine millimeter rounds were located in the magazine of the nine millimeter handgun that was

recovered from the closet in apartment 151. Those rounds were of the type manufactured by Federal, and they were of the Hydra-Shok style. One bullet, consistent with one having been fired from the nine millimeter handgun, was recovered from the body of the victim during his autopsy. It also was a nine millimeter Hydra-Shok round manufactured by Federal. No identifiable latent fingerprint impressions were recovered from any of the shell casings.

"In making a finding of probable cause, the trial court must determine whether the evidence offered would warrant a person of reasonable caution to believe that the accused had committed the charged offense. . . . The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances. . . . On appellate review of a probable cause hearing, we must examine the evidence presented to the trial court at that hearing and determine whether it was sufficient to warrant a person of reasonable caution to believe that the accused had committed the charged offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 652–53, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

The defendant argues that although the evidence reasonably might "justify an inference that either the defendant or Kave fired the fatal shot" that killed the victim, "the only inference that can be derived from [the] facts is that there is a [50] percent possibility that the defendant fired the fatal shot . . . . And there is a [50] percent possibility [that] Kave fired the fatal shot." He

argues that this is insufficient to support a finding of probable cause to try him for murder. We disagree with the defendant's assertion that probable cause requires more than a 50 percent likelihood, which essentially would amount to a preponderance of the evidence, that the defendant committed the crime, and we conclude that the evidence presented at the defendant's hearing in probable cause would warrant a person of reasonable caution to believe that the defendant had murdered the victim.

Our conclusion is guided by our Supreme Court's decision in *State* v. *Munoz*, supra, 233 Conn. 135, where the court held that the preponderance of the evidence standard is an improper standard in evaluating the evidence at a probable cause hearing. The court explained that "probable cause is not the same as a preponderance of the evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence."[5] Id.; see *Skakel* v. *State*, 295 Conn. 447, 479 n.22, 991 A.2d 414 (2010) ("The existence of probable cause does not . . . turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less

[5] In *Munoz*, our Supreme Court explained that the trial court, at the defendant's probable cause hearing, had stated: "Preponderance of the evidence is 51 percent standard of proof. In fact, the State's asking me to find by 51 percent, that [the defendant] committed this crime, and defense in effect, is asking me by 51 percent, to find that the other person in the car finished off the victim. And while there's evidence to support the State's request, there's no evidence to support the Defendant's request. . . . [B]ased on the evidence that's been presented to me, I can find by a preponderance of the evidence . . . [the defendant's] responsibility in this, again, by 51 percent." (Internal quotation marks omitted.) *State* v. *Munoz*, supra, 233 Conn. 135 n.22. The defendant argued that the court had used an improper standard to determine whether there was probable cause. The Supreme Court "agree[d] with the defendant that the court used an improper standard." Id., 135. It "also conclude[d], however, that the impropriety inured to the defendant's benefit, rather than to his detriment, and that, therefore, the court's finding of probable cause was not so flawed as to require a new hearing." Id.

than proof by a preponderance of the evidence." [Internal quotation marks omitted.]); *State* v. *Grant*, 286 Conn. 499, 516 n.10, 517–18, 944 A.2d 947 (proof of probable cause does not require certainty or reasonable belief that it was more likely than not, and mere possibility of innocent explanation for evidence connecting defendant with crime does not preclude finding of probable cause), cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008); see also *Illinois* v. *Gates*, 462 U.S. 213, 244 n.13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) ("probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity"). Accordingly, on the basis of our clear precedent, we reject the defendant's claim that there was insufficient evidence to support a finding of probable cause that he murdered the victim.

The judgment is affirmed.

In this opinion the other judges concurred.