******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LEVARR FRASIER
(AC 38625)

DiPentima, C. J., and Keller and Prescott, Js.

*Argued September 16—officially released November 29, 2016*

(Appeal from Superior Court, judicial district of New Haven, O'Keefe, J.)

*Emily Wagner*, assistant public defender, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Levarr Frasier, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a,[1] assault in the first degree in violation of General Statutes § 53a-59 (a) (5),[2] and carrying a pistol without a permit in violation of General Statutes § 29-35.[3] On appeal, the defendant claims that (1) the court improperly instructed the jury on accessorial liability and (2) he was denied his right to a fair trial due to prosecutorial impropriety. We affirm the judgment of the court.

The jury reasonably could have found the following facts. Prior to the night in question, Adrian Redmond and Travis James had several altercations regarding the mother of Redmond's child. James and the child's mother were dating, and Redmond took offense to James "going around telling people about some [explicit] photos that she had sent [James]." In addition, James believed that Redmond and the child's mother still had an ongoing relationship. Redmond confronted James and requested that he stop publicizing the photographs. In response, James threatened Redmond, warning him that "I'll have you killed" and "just wait here and you'll see. I'll have you shot right now because I have somebody who wants you dead anyway."

William Brown, a longtime friend of Redmond, was often with Redmond during the disputes between James and him. In the late evening of January 11, 2011, Brown drove Redmond to the Crown Fried Chicken restaurant on Dixwell Avenue in New Haven to get something to eat. While Brown and Redmond were parked at a corner near the restaurant, James and the defendant exited the restaurant, and James approached the driver's side window of Brown's vehicle. In addition to his threats to Redmond, James had been leaving threatening voice messages on Brown's phone because James believed Brown was "playing both sides of the fence" in his dispute with Redmond. James and Brown then engaged in a heated argument, and Brown demanded that James stop leaving threatening voice messages on his phone.

At one point, James said that he was "at the end of his rope" and did not "care about life anymore." Redmond attempted to diffuse the argument and stated that "it's not that serious," and sought to settle their differences at another time. James remained furious and walked away from the vehicle toward the defendant. After a brief conversation, James and the defendant then returned to the driver's side of Brown's vehicle. James again mentioned that Brown was "playing both sides of the fence," and directed the defendant to kill both of them. The defendant then pulled out a firearm and opened fire.

Redmond was shot in the left elbow and managed to

flee to a nearby alley. Brown also was able to flee the vehicle but was shot and collapsed on the street. Once the defendant stopped shooting, he and James fled. Police arrived at the scene shortly after the shooting and found Brown lying unconscious on the street. Brown was transported to the Hospital of St. Raphael where he spent a week on life support before he died from the gunshot wounds. Redmond was transported to Yale-New Haven Hospital and eventually recovered from his injuries.

At the hospital, Redmond spoke to Detective Wayne Bullock regarding the shooting. Redmond identified James and the defendant, by their street names, as those responsible for the attack and named the defendant as the shooter.[4] Bullock followed up on this information and learned that James and the defendant were known to associate with one another and were frequently in the neighborhood where the shooting occurred.

The defendant was arrested three days after the shooting by Officer John Palmer. After voluntarily waiving his *Miranda* rights, the defendant made several statements to police indicating that he was with George White at White's home at the time of the shooting, where he remained until he walked home at 2 a.m. on January 12. Bullock followed up with White who provided a different story.[5] Bullock then confronted the defendant with White's account, but the defendant refused to change his story.

Bullock conducted a second interview with White approximately one month after the attack. During this interview, White provided a different account from his earlier one and explained that after he got out of work at 10 p.m. on January 11, he picked up the defendant, they purchased marijuana, and then went back to his home. White stated that the defendant "didn't seem himself" and that the defendant told White either "I think I shot somebody" or "I shot someone tonight." According to White, the defendant stayed at his home until the following morning.

The defendant subsequently was charged, solely as the principal, with murder, assault in the first degree, and carrying a pistol without a permit and was tried by a jury. The jury was unable to reach a verdict, and the court declared a mistrial. The defendant was tried again and charged, as a principal or an accessory, with murder, assault in the first degree, and carrying a pistol without a permit. The jury acquitted the defendant of murder and convicted him of the lesser included offense of manslaughter in the first degree with a firearm, assault in the first degree, and carrying a pistol without a permit. The court rendered judgment accordingly and sentenced the defendant to forty years of incarceration. This appeal followed.

I

The defendant first claims that the court improperly instructed the jury on the doctrine of accessorial liability. He maintains that the court's instructions were improper in three ways, which we analyze in turn: (1) that the court's "intentionally aid" instruction was misleading; (2) that the court's instruction that it was "not necessary to prove that the defendant was actually present or actively participated" was misleading; and (3) that "the court erroneously merged all of the offenses into a single instruction." We disagree.[6]

As a preliminary matter, we note that the defendant neither filed a written request to charge nor objected to the court's instructions as given. "It is well established that [t]his court is not bound to review claims of error in jury instructions if the party raising the claim neither submitted a written request to charge nor excepted to the charge given by the trial court." (Internal quotation marks omitted.) *State* v. *Serrano*, 91 Conn. App. 227, 244, 880 A.2d 183, cert. denied, 276 Conn. 908, 884 A.2d 1029 (2005). The defendant now seeks review of his claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 587 A.2d 823 (1989).[7] "Under *Golding*, a defendant may prevail on an unpreserved claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Tarver*, 166 Conn. App. 304, 321, 141 A.3d 940, cert. denied, 323 Conn. 908,     A.3d    (2016).

We will review the defendant's claim here because the record is adequate for review and the defendant's claim that the court improperly instructed the jury is of "constitutional dimension." *State* v. *Hines*, 89 Conn. App. 440, 455, 873 A.2d 1042 (claims of improper jury instructions "as to an element of a charged offense is of constitutional dimension"; thus *Golding* review is appropriate), cert. denied, 275 Conn. 904, 882 A.2d 678 (2005). We conclude however, that the defendant has failed to demonstrate the existence of a constitutional violation that deprived him of a fair trial.[8]

At the conclusion of the court's instruction on the elements of the charged offenses, the court stated that "[a]ll the language that I've given you up to this point has been about being convicted as a principal, the shooter. . . . This is language which pertains to another theory of responsibility called accessory." The court defined an accessory as "[a] person acting with the mental state required for the commission of an offense, who solicits, requests, commands, importunes, or intentionally aids another person to engage in con-

duct which constitutes [an] offense shall be criminally liable for such conduct and may be prosecuted and punished . . . as if he were the principal offender."

The court then outlined the requirements under General Statutes § 53a-8 (a) constituting criminal liability as an accessory.[9] Throughout the court's accessory instruction, it defined intent generally and iterated that "[i]ntentionally aid . . . means to act in any manner, the conscious objective . . . of which is to assist, help, or support. If the defendant did any of these things . . . he is guilty of murder, assault in the first degree, or any lesser included offenses, depending on . . . what you determined, just as though he had directly committed it or participated in the commission of those crimes."

The court further instructed the jury that "[t]o establish the guilt of a defendant as an accessory for assisting in the criminal act of another, the State must prove criminality of intent and community of unlawful purpose. That is, for the defendant to be guilty as an accessory, it must be established that he acted with the mental state necessary to commit murder, any of the lesser included offenses, assault in the first degree or any of the lesser included offenses, and that in furtherance of the crime, he solicited, requested, commanded, importuned, or intentionally aided the principal to commit murder, assault in the first degree, or any of the lesser included offenses. Evidence of mere presence as an inactive companion or passive acquiescence or the doing of innocent acts which in fact aid in the commission of a crime is insufficient to find the defendant guilty as an accessory under the statute. Nevertheless, it is not necessary to prove that the defendant was actually present or actively participated in the actual commission of the crime . . . . For you to find the defendant guilty of this charge . . . you must unanimously find that the State has proven all the elements of whatever crime you find proven beyond a reasonable doubt. If you conclude the defendant is guilty as a principal or as an accessory, you do not need to be unanimous regarding whether you believe he was a principal or accessory as long as all twelve jurors agree that at least one method, principal or accessory, has been proven beyond a reasonable doubt."

At the conclusion of its charge, the court advised the jury to send a note to the court if it had any questions. The court stated that "[i]f you send me a lot of notes, that's okay. If you don't send me any notes, that's fine too. . . . By explaining the note process, I'm not trying to encourage or discourage you from sending notes. If you have a question put it in a note. I'll read it [and] answer it if I can." The jury was also aware that its questions should "be as specific as possible."

During deliberations, the jury sent a note to the court requesting clarification on accessorial liability. The

court answered the question by stating that "[a]ccessorial liability doesn't create a new count or a new crime. . . . The State is entitled to . . . put in . . . a different theory of liability [other than as principal]. . . . [T]hey are [also] entitled to say to the jury, we've charged this defendant as the shooter, but we also want you to consider the theory . . . where . . . if he is not the shooter, he intentionally aided the shooter. . . . Keep in mind, that to be legally responsible as an accessory, you have to have the same intent as the principal, as the shooter."

In response to the jury's question, the court provided an example of accessorial liability. The court stated "[i]f you innocently give a ride to someone who is going to rob a bank, and they go in and rob a bank, and . . . you don't know what they're [going to do] . . . you are not guilty of bank robbery. If you're in with the bank robber and have the same intent to rob the bank and drive the car, you're as responsible as the . . . person who went inside. . . . The important part is that . . . [y]ou have to have the same intent as the . . . principal if you're the accessory. . . . Focus on the written instructions . . . that I gave you. Those include the elements, which of course have to be proven beyond a reasonable doubt."

As previously noted, we review the defendant's unpreserved claims of instructional error under *Golding*. "[I]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a right decision in a particular case." (Internal quotation marks omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 288–89, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016). "As long as [the

instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) Id., 288.

## A

The defendant first argues that the jury was misled by the court's "intentionally aid" instruction. Specifically, the defendant argues that the jury was permitted to convict the defendant "if he engaged in any conduct with the intent [necessary for the] offenses, rather than conduct that aids . . . ." This argument is perplexing. The court explicitly stated that, to convict the defendant as an accessory, "it must be established that he acted with the mental state necessary to commit . . . [the principal's intended crime] and that in furtherance of that crime, he solicited, requested, commanded, importuned, or intentionally aided the principal to commit" the crime. This language unequivocally refutes the defendant's argument. The court instructed the jury that the intent for accessorial liability was distinct from principal liability and that to convict the defendant as an accessory, both levels of intent must be found.

The defendant also contends that the court's instruction that "[i]ntentionally aid . . . means to act in any manner, [with] the conscious objective . . . to assist, help, or support," lowered the state's burden of proof and eliminated the requirement that the defendant actually assist in the commission of the crime. We disagree.

Immediately preceding the court's definition of "intentionally aid," the court informed the jury of a separate definition of intent that "[a] person acts intentionally with respect to a result when his conscious objective is to cause such result." The court sought to provide clarity among these distinct definitions and stated that "[t]o establish the guilt of a defendant as an accessory for assisting in the criminal act of another, the State must prove criminality of intent and *community* of unlawful purpose." (Emphasis added.) The court's charge, viewed in its entirety, did not permit the jury to convict the defendant as an accessory without finding both levels of intent.

The defendant also takes issue with the court's use of the phrase "to act in any manner" when defining "intentionally aid." The court's use of that phrase is not problematic. The court instructed that the defendant's conduct, to be guilty as an accessory, required the same intent as the principal to accomplish the intended crime, in addition to the intent to aid the principal. The court's later discussion of "intentionally aid" clarified that the jury's responsibility was to find that the defendant possessed two distinct levels of intent, not that the defendant could act in any general manner and still be culpable. The court's instruction of "any manner" was limited to the specific intent to "assist, help, or support,"

in the context of "intentionally aiding" as an accessory.

In our view, the court's instruction charged the jury to find the defendant guilty as an accessory if his conduct was intended to "assist, help, or support" the principal and that he also possessed the same intent as the principal. In addition, the court read the statute aloud to the jury and provided copies of the instructions containing the elements and definitions of accessorial liability, and clarified the meaning of accessorial liability at the jury's request. We thus disagree that there is any reasonable possibility that the jury was misled.

B

Next, the defendant argues that, in light of the specific facts of this case, the jury was misled by the court's instruction to the jury that "it is not necessary to prove that the defendant was actually present or actively participated in the actual commission of the crime of murder, assault, or any of the lesser included offenses." Specifically, the defendant argues that two particular sentences within the court's accessorial instruction are "flatly inconsistent" and that the jury was misled by the statements. We disagree.

The challenged instruction provided that: "Evidence of mere presence as an inactive companion or passive acquiescence or the doing of innocent acts which in fact aid in the commission of a crime is insufficient to find the defendant guilty as an accessory under the statute. Nevertheless, it is not necessary to prove that the defendant was actually present or actively participated in the actual commission of the crime of murder, assault, or any of the lesser included offenses." The defendant argues that the first sentence of the preceding excerpt is inconsistent with the second sentence. Further, the defendant argues that the second sentence was misleading and confusing because, in this case, the state was required to prove that the defendant was present and actively participated in the commission of the crime.

The first challenged statement instructed the jury, in essence, that simply being present at the scene is insufficient to find the defendant guilty as an accessory. The second challenged statement, in contrast, identified that accessorial liability does not require physical presence, so long as the accessory intentionally aided in the commission of the crime and simultaneously possessed the same intent as the principal. These statements, when viewed in context, provide a helpful and illustrative distinction between what constitutes accessorial liability and what does not. The court further clarified this concept when it provided the "bank robbery" example following the jury's questions.[10]

After examining the court's instructions in their entirety, the instructions were not misleading, but were designed to assist the jury in understanding the concept

of accessorial liability. Before making the challenged statements, the court had instructed the jury that the defendant must have intentionally aided the principal in the commission of the underlying crime. The challenged statements then distinguished conduct that constitutes accessorial liability and conduct that does not. The defendant's argument takes the challenged statements out of context when in fact they appropriately described the range of conduct that constitutes accessorial liability. The challenged statements were intended to provide a comprehensive example to "the meaning of a complex legal concept"; *State* v. *Hines*, 187 Conn. 199, 210, 445 A.2d 314 (1982); and that example was not an "unfair statement of the law which it was offered to illustrate." Id., 212–13. Accordingly, we conclude that the challenged statements were neither inconsistent nor misleading.

C

Finally, the defendant argues that the court's accessorial liability instructions failed to properly "delineate the intent and conduct" necessary to convict the defendant as an accessory with respect to each charge and as a result, reduced the state's burden of proof and erroneously merged the offenses. Specifically, the defendant argues that the court's singular accessorial instruction that followed the charge on the specific elements of the substantive offenses improperly permitted the jury to convict the defendant as an accessory with respect to a particular offense if it found he intentionally aided the principal, but possessed an unrelated intent regarding any of the underlying substantive crimes for which he was charged. We disagree.

The court first instructed the jury on the elements of each substantive offense and then gave the accessorial liability instruction. The court instructed the jury that to find the defendant guilty as an accessory "it must be established that [the defendant] acted with the mental state necessary to commit murder, any of the lesser included offenses, assault in the first degree or any of the lesser included offenses, and that in furtherance of that crime, he solicited, requested, commanded, importuned, or intentionally aided the principal to commit murder, assault in the first degree, or any of the lesser included offenses." The defendant argues that, for example, this instruction allowed the jury to find the defendant guilty of manslaughter if the jury found he possessed the intent to cause serious physical injury, but instead aided in the commission of assault.

Contrary to the defendant's argument, the court was clear throughout its instructions that it was necessary to find that the defendant possessed the same intent as the principal for each particular offense. The court instructed the jury to "[k]eep in mind, that to be legally responsible as an accessory, you have to have the *same* intent as the principal, the shooter." (Emphasis added.)

In our view, the court's instructions were unambiguous and neither diluted the state's burden of proving the defendant's guilt nor misled the jury. Instead, the jury was instructed that in order to convict the defendant, he must have possessed the same intent as the principal, in addition to the intent to intentionally aid the principal. The court also provided the jury with written copies of the instructions that accurately stated the law of the substantive charged offenses and accessorial liability. Additionally, the court's instruction to the jury that the defendant act in "furtherance" of the underlying crime exemplifies that it was necessary for the jury to find that the defendant possessed the same intent as to the principal's underlying crime and that the defendant acted with the intent to intentionally aid the principal in the commission of that offense.

When viewed in their entirety, the court's oral and written instructions sufficiently enabled the jury to consider each charged substantive offense because the court separately described the necessary elements that the state must prove beyond a reasonable doubt. The court's instructions did not merge all of the offenses into a single instruction. Accordingly, the court's instructions were not improper.

## II

The defendant also claims that he was denied a fair trial due to prosecutorial impropriety. Specifically, he argues that during closing arguments, the prosecutor impermissibly (1) shifted the burden of proof to the defendant and (2) misstated the evidence. We conclude that there was no impropriety, and therefore do not address the defendant's claim that the alleged improprieties violated his federal and state due process right to a fair trial.

As a preliminary matter, we note that the defendant did not preserve his claim by objecting at trial to the challenged statements. However, "[o]nce prosecutorial impropriety has been alleged . . . it is unnecessary for a defendant to seek to prevail under *State* v. *Golding* . . . and it is unnecessary for an appellate court to review the defendant's claim under *Golding*. . . . In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Fasanelli*, 163 Conn. App. 170, 174, 133 A.3d 921 (2016).

## A

The defendant first argues that the state "unfairly

shifted" the burden of proof to the defendant during its closing and rebuttal argument. He asserts that the prosecutor's argument suggested to the jury that the defendant was required to "produce a compelling" defense theory, thereby shifting the burden from the state to the defendant. We disagree.

During his closing argument, the prosecutor stated to the jury that the state was "not sure what the theory of defense here is, and we're all going to hear that for the first time in a few minutes. I can guess, I can surmise, and maybe one of those theories is, that well the defendant . . . was not on Pond and Dixwell at 10:06 p.m. back on January 11, 2011. Another one may be, well [the defendant] was there, but the other guy did it. [James] is the shooter. I'm not sure . . . if either of those will pan out, but we'll hear that in a minute."

During rebuttal, the prosecutor stated: "I'm not exactly sure . . . what the theory of defense is. Is it that [the defendant] was there but he didn't do the shooting or he was playing with pit bulls for nine hours at his friends . . . house? I'm not sure about that." Throughout its closing and rebuttal arguments, the state identified evidence presented throughout the course of the trial that supported its case and consistently stated that the burden rested with the state.

It is well established that "prosecutors are not permitted to misstate the law . . . and suggestions that distort the government's burden of proof are likewise improper . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 77, 43 A.3d 629 (2012). Furthermore, "[our Supreme Court] previously has acknowledged: [P]rosecutorial [impropriety] of constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [A] prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) Id., 76.

The defendant argues that the prosecutor's statements during closing and rebuttal argument "shifted its burden of proof" by suggesting that the defendant was required to produce evidence to prove his innocence. Further, the defendant asserts that the prosecutor's statements called for the defendant to produce a "successful theory of defense for the jury" and, in doing so, improperly shifted the burden.

The state counters that, when viewed in context, the

prosecutor's statements are merely assumptions and that "it is clear that the prosecutor was not questioning whether the theories of the defense would . . . be convincing—but whether defense counsel would, in his closing, actually would be making the arguments described by the prosecutor." Next, the state argues that the prosecutor was commenting on conflicting evidence, where the defendant was at the time of the shooting, that should be considered a "fair argument, as it was based on the evidence." Finally, the state claims that the prosecutor "never argued that the defendant had to successfully prove [his defense] to avoid conviction."

The defendant identifies two cases to support his claim. First, the defendant claims that *United States* v. *Simon*, 964 F.2d 1082 (11th Cir. 1992), cert. denied, 507 U.S. 1033, 113 S. Ct. 1854, 123 L. Ed. 2d 476 (1993), is analogous to the facts here. The prosecutor in *Simon* suggested that, based on common sense, if the defendant was innocent, he would have produced exculpatory evidence, thus implying the burden rested with the defendant. Id., 1086–87. In *Simon*, the United States Court of Appeals for the Eleventh Circuit observed that "[p]rosecutors must refrain from burden-shifting arguments which suggest that a defendant has an obligation to produce any evidence or to prove innocence." Id., 1086.

Second, in *State* v. *Williams*, 41 Conn. App. 180, 674 A.2d 1372, cert. denied, 237 Conn. 925, 677 A.2d 950 (1996), the defendant raised an alibi defense, and even though the burden rested with the state to disprove the defense, the prosecutor in that case improperly shifted the burden. Id., 185–86. We stated that "[d]espite the defendant's objections that he did not have the burden of proving his alibi defense and the trial court's rulings that the state was misrepresenting its burden of proof to the jury, the prosecutor repeatedly maintained that the defendant purposefully and selectively showed unclear surveillance photographs to the jury because he had no better evidence in support of his alibi . . . ." Id., 186–87. We held that the state's suggestion that the defendant had "no better evidence," was improper because it tended to "distort the state's burden of proof and . . . allocate[d] to the defendant the burden . . . ." Id., 187.

After a review of the record, we conclude that the prosecutor's statements in the present case were not improper because it is unlikely the jury would have understood the argument in the manner claimed by the defendant. During closing and rebuttal argument, the prosecutor conveyed several times to the jury that the burden of proving the defendant's guilt rested with the state and identified relevant evidence that supported the state's case and would assist the jury in making its findings. Contrary to the defendant's argument, the

state never shifted the burden to the defendant and did not suggest that the defendant was required to set forth a "legitimate" defense. Instead, the prosecutor speculated what the defendant might argue on his closing argument and questioned the plausibility of the defendant's arguments. These statements were fair and reasonably based upon the facts in evidence.

Additionally, the challenged statements here are not akin to those found improper in *Simon* or *Williams*. Here, the state speculated what the defendant might argue during his closing argument based on reasonable inferences drawn from the evidence and attempted to discredit it. The prosecutor presumably made these statements to ensure that the jury focuses on what the state deemed "pertinent" evidence. Again, the prosecutor's statements did not imply that the defendant was required to raise a defense. Instead, the challenged statements were reasonable observations based upon the evidence presented. Thus, we conclude that the state did not shift the burden of proof to the defendant.

### B

Next, the defendant argues that during the state's closing argument "the prosecutor misstated George White's testimony in such a way as to make it more incriminating." We disagree.

During trial, White testified that he was good friends with the defendant and that he was with the defendant around 10:30 p.m. on January 11, 2011. White testified that he picked the defendant up approximately one block from the defendant's house; they went to purchase marijuana, and then returned to White's house to smoke and watch television. According to White, the defendant stayed overnight at his house and left the following morning.

The prosecutor asked White if "[a]t some point in time [on the] evening [of January 11, 2011] when [the defendant] was in your room, did he say something about [what] he did before you picked him up on the evening of January 11, 2011." White testified that the defendant told him that "I think I shot somebody." White did not ask any follow-up questions because White "did not want to get involved" in something that did not involve him. In addition to White's testimony, Bullock testified that he was told by White during an interview, that the defendant told White that "I shot someone *tonight*." (Emphasis added.)

During closing argument, the prosecutor stated in relevant part: "[The defendant] obviously, from the video, ran down Pond Street and probably got down to that wooded area of Arch Street, where he eventually hooked up with his good friend George White, whose testimony, I would submit, went unimpeached and virtually unchallenged. And Mr. White said he picked up the defendant in that location and that they went back

to Mr. White's house up on Fitch Street, where the defendant then tells him that he shot somebody that *night*." (Emphasis added.) Near the end of the state's rebuttal argument, the prosecutor again recounted White's contact with the defendant on January 11, and stated that the defendant told White that "I shot somebody."

The defendant argues that the prosecutor's use of the phrase "that night" when describing White's testimony was improper. Specifically, the defendant argues that the statements improperly portrayed White's testimony, and in doing so, made it "more incriminating" because White never testified that the defendant used that specific phrase. Further, the defendant claims that the prosecutor's omission of "I think" from the defendant's statement that "I think I shot somebody" constitutes impropriety.

The state counters by arguing that "the challenged arguments were based in the evidentiary record" and were not a "more incriminating version" of White's testimony, and thus the defendant's claims should be rejected. The state argues that the prosecutor did not "state that White testified" but instead argued that the defendant told White "that he shot somebody that night." The state also argues that the prosecutor's portrayal of White's testimony was a reasonable inference based on the evidence. Further the state urges this court to resist parsing the language used by the prosecutor during closing arguments.

It is well established that a prosecutor may not make "[a]n appeal to emotions that improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record." (Internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 10, 124 A.3d 871 (2015). Further, "[w]e must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Internal quotation marks omitted.) *State* v. *Chase*, 154 Conn. App. 337, 345, 107 A.3d 460 (2014), cert. denied, 315 Conn. 925, 109 A.3d 922 (2015).

Here, the prosecutor attempted to persuade the jury to infer that the defendant actually shot someone on January 11, 2011. The defendant stated to White that he thought he shot somebody hours after the shooting took place. It is not unreasonable to infer that the defendant indeed shot someone the same night because he divulged to his close friend that he thought he shot somebody within hours of the shooting. Additionally, White told Bullock that the defendant said "I shot someone tonight" when interviewed after the shooting.

The prosecutor's statements were not a mischarac-

ization of the evidence, but instead were permissibly based on reasonable inferences from evidence introduced at trial. See *State* v. *Warholic*, 278 Conn. 354, 367, 897 A.2d 569 (2006) ("the prosecutor may argue for the reasonable inferences that the jury may draw from the evidence adduced at trial, including the defendant's commission of the crime"). The prosecutor's argument that the defendant shot someone the night of January 11, 2011, is supported by reasonable inferences and the direct testimony of Bullock regarding his interview of White. Thus, the statements were not a mischaracterization of the evidence. Accordingly, we conclude that the prosecutor's comments were not improper.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-55a (a) provides in relevant part: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. . . ."

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[3] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[4] Redmond testified that he knew the defendant as "Bolo" and James as "Tank."

[5] Bullock had a conversation with White over the phone. White told Bullock that he saw the defendant on January 11, 2011, at a gas station near his home between 1 p.m. and 5 p.m., and "they just went on their separate ways after saying hello."

[6] We note that the court provided the jury with copies of the model jury instructions from the Judicial Branch website that contained handwritten edits by the court incorporating the facts and charges of this case. "[T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . [an appellate court] will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Davis*, 255 Conn. 782, 798, 772 A.2d 559 (2001). Although it may have been preferable that the court presented the charge in a more precise and lucid manner, the instructions provided here to the jury were, in our view, sufficient under the criteria discussed in *Davis*.

[7] We note that the state has not claimed that the defendant implicitly waived a claim of instructional error pursuant to *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011).

[8] The defendant also claims that his conviction should be reversed under the plain error doctrine. See Practice Book § 60-5. "Review under the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Additionally, the claimed error must be both clear and harmful enough such that a failure to remedy the error would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Aponte*, 66 Conn. App. 429, 439, 784 A.2d 991 (2001), cert. denied, 259 Conn. 907, 789 A.2d 995 (2002). In light of our resolution of the defendant's claims, that standard is not met.

[9] General Statutes § 53a-8 (a) provides that: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such

conduct and may be prosecuted and punished as if he were the principal offender.''

[10] As noted previously in this opinion, the court provided an example of accessorial liability following a question from the jury during its deliberations.

---