******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

## STATE OF CONNECTICUT *v.* QUAN SOYINI
## (AC 40059)

DiPentima, C. J., and Elgo and Harper, Js.

*Syllabus*

Convicted of the crimes of murder as an accessory and conspiracy to commit murder, the defendant appealed, claiming, inter alia, that the evidence was insufficient to support his conviction and that the trial court's jury instructions violated his right to a fair trial. The defendant had asked his brother, K, to help him locate the victim, who previously had robbed the defendant at gunpoint. When the defendant saw the victim on a street, he called K and gave him a description of the victim. The victim had gone into the house of R and G and told them that some guys were trying to kill him, and then ran into a school parking lot behind their house, where he was shot to death by K. The police concluded from a video recording of the parking lot that the defendant had been wearing the same clothes as a person in the video recording who had walked through the parking lot shortly after the shooting. K later pleaded guilty in a separate proceeding to having murdered the victim. *Held*:

1. The evidence was sufficient to support the defendant's conviction of murder as an accessory and conspiracy to commit murder: there was sufficient evidence presented to show that the defendant had the intent to cause the death of the victim, an element necessary to both crimes, as the state built a chain of inferences that established, beyond a reasonable doubt, that the defendant's conduct on the morning of the shooting was not passive acquiescence but rather active involvement, including his conduct in soliciting K's assistance and helping K locate and identify the victim, certain comments of K that implicated the defendant, and K's lack of motive or intent to kill the victim, independent of the defendant's interest in revenge, which demonstrated an intent that the defendant shared with K to cause the death of the victim; moreover, the state produced sufficient evidence from which the jury reasonably could have inferred that the defendant knowingly and wilfully assisted K in the acts that prepared for and facilitated the murder, and that the defendant had entered into an agreement with K to cause the death of the victim, as the evidence showed that the defendant had a motive to seek revenge against the victim, the defendant called K, requested his help and provided him with a description of the victim, the defendant and K had searched twice for the victim, who told R and G that some "guys" were trying to kill him, and the defendant appeared at the residence of R and G, and asked if someone had gone through the residence moments after the victim left the residence.

2. The defendant could not prevail on his unpreserved claim that the trial court violated his right to a fair trial when it failed to instruct the jury that it could not use K's previous guilty plea to find that the crime of murder had been proven beyond a reasonable doubt and when it stated to the jury that K was the principal offender in the murder: the jury could not have been misled thereby, as the court's instructions provided the jury with a clear understanding of the elements of the crimes charged, informed the jury that the state had to prove each element of the offense, including identification of the defendant, beyond a reasonable doubt, afforded proper guidance for the jury's determination of whether those elements were proved by the state, provided that the state had to prove that the defendant was the perpetrator of the crime and that the jury had to determine the intent of the defendant, and limited the jury's use of K's testimony regarding his conviction of murder to the determination of his credibility.

3. There was no merit to the defendant's unpreserved claim that the trial court committed plain error by giving the jury an unwarranted special credibility instruction on accomplice testimony, which was based on his assertion that K had no hope of obtaining favorable treatment from the state in exchange for his testimony because he already had pleaded guilty to and been sentenced for the murder of the victim; the defendant did not demonstrate that the accomplice instruction constituted an error

that was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal, as required under plain error analysis, and even if it was assumed that such error existed, the accomplice instruction did not constitute manifest injustice, as the defendant failed to demonstrate that the challenged instruction was of such monumental proportion that it threatened to erode the system of justice or that it resulted in harm so grievous that fundamental fairness required a new trial.

Argued September 25, 2017—officially released March 13, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of murder as an accessory and conspiracy to commit murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Kwak, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Tejas Bhatt*, assistant public defender, with whom, on the brief, was *Jennifer L. Bourn*, assistant public defender, for the appellant (defendant).

*Leonard C. Boyle*, deputy chief state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *John F. Fahey*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Quan Soyini, appeals from the judgment of conviction, rendered after a jury trial, of being an accessory to murder in violation of General Statutes §§ 53a-54a[1] and 53a-8[2] and conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48.[3] On appeal, the defendant claims that (1) there was insufficient evidence to sustain his conviction of both crimes, (2) the court's improper jury instructions violated his right to a fair trial and (3) the court committed plain error by giving a special credibility instruction on accomplice testimony, which was unwarranted in this case. We disagree and, accordingly, affirm the judgment of conviction.

The jury reasonably could have found the following facts. In early July, 2013, the defendant and his brothers, Kunta Soyini (Kunta) and Quincy Soyini (Quincy), attended the funeral of their father. At the funeral, the defendant revealed to Quincy that he had been robbed at gunpoint while selling marijuana to the victim, Chimer Gordon.[4] On the day of the robbery, the defendant had asked Kunta to help him find the victim, but the two brothers were unable to locate him.

Subsequently, on July 10, 2013, at approximately 10 a.m., the defendant saw the victim and called Kunta. Kunta drove to the defendant's location on Vine Street in Hartford. At that time, the defendant was driving a black Audi. Both Kunta and the defendant searched for the victim.

At some point, the victim became fearful and ran into the house of Robert Davis and Gussie Mae Davis, which was located on Greenfield Street. After apologizing for the intrusion, the victim stated to the Davises that "*they* was trying to kill" him and that if he called the police "*they're* gonna kill my family." (Emphasis added.) Gussie Mae Davis called 911, reporting that the victim, after entering her home, had stated that "*guys* was after him to kill him." (Emphasis added.) The victim, after exiting the residence, ran into the parking lot of the Thirman Milner School (school), which is located behind the Davises' house. Moments later, the defendant drove up to the house and asked Robert Davis if "a guy" had run through the house.

At this point, Kunta drove down Magnolia Street and saw the victim, who was wearing clothing that matched the description he had received from the defendant.[5] Kunta had no prior or pending disagreements with the victim and did not know him at all.[6] Kunta exited his motor vehicle, walked through the school parking lot and approached the victim, who was crouched between parked cars.[7] Kunta walked through the parking lot in the direction of the victim while talking on a cell phone and with his left hand in his pocket. Kunta then faced the victim and, when he was at a distance greater than

one car length, removed a firearm from his left pants pocket. The victim was tying his shoe as Kunta aimed the firearm at him. The victim then turned to his left, got up and ran. While pursuing him, Kunta shot at the victim from close range, but missed. Kunta continued to chase the victim as he ran through the parking lot.[8]

A few moments later, the defendant, wearing a black T-shirt, black and red shorts, black ankle length socks and flip-flops, walked through the school parking lot in the opposite direction from Kunta.[9] As Roderick Maxwell, a special police officer employed by the Hartford Board of Education, investigated the noises that he had heard, he encountered the defendant. The defendant told Maxwell, "don't worry about a thing."[10]

The victim unsuccessfully attempted to scale a gate. Kunta then shot the victim in the chest, got in his car, and drove away.[11] Maxwell heard Kunta emit a "ghastly, nightmarish laugh" as he left the area.

Jay Montrose, a Hartford police officer, responded to the 911 call. Montrose spoke with the Davises and then went outside, where he learned from Maxwell that the victim was lying on the ground near a fence. After driving his police vehicle into the school's parking lot, Montrose observed that the victim had suffered a gunshot wound and had lost a fair amount of blood. Montrose commenced resuscitation efforts on the victim. Medical personnel arrived shortly thereafter and transported the victim to a hospital, but he succumbed to his injuries and died.[12]

Reginald Early, a sergeant in the Hartford Police Department, was assigned to investigate this homicide. He reviewed a video recording of the school parking lot. Early also learned that a black Audi had been circling the neighborhood prior to the shooting. The defendant was inside the car when investigating officers located the black Audi approximately one block from the school. The officers arrested the defendant on an unrelated charge of possession of marijuana with intent to sell. Early concluded that the defendant was wearing the same clothes as the person on the video recording who had walked through the school parking lot shortly after the initial shooting.

Joseph Fargnoli, a Hartford police detective, interviewed the defendant following his arrest. He showed the recording from the school parking lot to the defendant, who confirmed that he and Kunta were the men in the recording. The defendant denied knowing the victim or how he had died. The defendant did, however, admit that he had spoken to an "old guy" on Greenfield Street that morning, asking if a "kid" had run through the house.

Fargnoli, who had examined the defendant's cell phone records,[13] determined that the defendant had called Kunta first on the day of the shooting. The defen-

dant, however, stated during his interview that Kunta had called him first, asking the defendant to "come over . . . ."[14]

On the morning of the shooting, Kunta had driven his girlfriend, Shumia Brown, to work in Bloomfield at 4 a.m. Kunta was supposed to pick Brown up at 11 a.m., but was late. When he finally arrived, Brown voiced her displeasure with his tardiness, particularly because Kunta was using her motor vehicle. He explained that he "got caught up in some mess with [the defendant]" but did not elaborate.

Later that day, Kunta told Brown that the defendant had called him and instructed that they meet on Vine Street because the defendant "ran into who had robbed him before." After traveling home, Kunta and Brown watched the afternoon news, and there was a story about the shooting at the school. Brown observed that Kunta started acting "funny" and not "like himself." Brown asked if Kunta and the defendant had anything to do with the shooting, and he hesitated in his response. At that point, Brown believed that Kunta had been involved in the shooting. Kunta then admitted to his involvement in the shooting. Additionally, at a later date, Kunta stated, during a phone conversation with Brown, that he had gotten "involved in some drama behind [the defendant]."

Following the defendant's arrest, Kunta fled to Virginia. He eventually was taken into custody by United States marshals and returned to Connecticut. Following his return, Kunta pleaded guilty to murdering the victim. In a statement to the police, Kunta noted that on the day of the shooting, the defendant had found the victim "walking around" and called to request that Kunta "help him."

In an information dated May 27, 2015, the state charged the defendant with being an accessory to murder and conspiracy to commit murder. The defendant pleaded not guilty, and his trial spanned several days in July, 2015. The jury found him guilty on both counts. The defendant received a total effective sentence of seventy years incarceration, with twenty-six years being the mandatory minimum. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that there was insufficient evidence to sustain his conviction of murder as an accessory and conspiracy to commit murder.[15] Specifically, he argues that the state failed to present sufficient evidence that he had intended to kill the victim, an element common to both crimes. Additionally, the defendant contends there was insufficient evidence that he aided Kunta in the shooting of the victim or that he formed an agreement with Kunta to cause the death of the victim. The state counters that there was "ample"

evidence to support the defendant's conviction of murder as an accessory and conspiracy to commit murder. We agree with the state that there was sufficient evidence to support the defendant's conviction of both crimes.

Initially, we set forth our well established standard of review. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015); see also *State* v. *Otto*, 305 Conn. 51, 65–66, 43 A.3d 629 (2012). Mindful of this standard of review, we consider the defendant's arguments in turn.

## A

The defendant first argues that the state failed to prove that he had the intent to cause the death of the victim, an element necessary for both crimes. See generally *State* v. *Patterson*, 213 Conn. 708, 712, 570 A.2d 174 (1990) (sufficient evidence at probable cause hearing of defendant's intent to cause death was prerequisite to continuing prosecution of defendant on accessory to murder and conspiracy to commit murder counts). We are not persuaded.

Our Supreme Court has recognized that "[i]n order to be convicted under our murder statute, the defendant must possess the specific intent to cause the death of the victim. . . . To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one." (Internal quotation marks omitted.) *State* v. *Bennett*, 307 Conn. 758, 765–66, 59 A.3d 221 (2013). A defendant's state of mind often is the most significant and most elusive element of the charged crimes. *State* v. *Bonilla*, 317 Conn. 758, 766, 120 A.3d 481 (2015). "[I]ntent may be proven by conduct before, during and after [a] shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Internal quotation marks omitted.) Id.; see also *State* v. *Carter*, 317 Conn. 845, 856–59, 120 A.3d 1229 (2015).

The defendant relies on the following in support of his claim: "[He] did not lead the victim to the shooter; and he did not distract the victim or act as a lookout. . . . [He] was not present when [the victim] was killed; he did not assist Kunta in fleeing the scene, nor did he depart with Kunta; and he did not commit another felony while in [the victim's] presence. . . . [T]he defendant here did not assist Kunta in fleeing the scene, and did not attempt to avoid apprehension. Finally, the existence of phone records to contradict some of this defendant's statements . . . should not be sufficient to sustain these convictions." We are not persuaded by these arguments.

### 1

As a preliminary matter, we set forth the elements of and relevant legal principles applicable to the crimes of murder as an accessory and conspiracy to commit murder. First, we note that "[t]his state . . . long ago adopted the rule that there is no practical significance

in being labeled an *accessory* or a *principal* for the purpose of determining criminal responsibility. . . . Under the modern approach, a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . [T]here is no such crime as being an accessory . . . . The accessory statute merely provides alternate means by which a substantive crime may be committed." (Emphasis in original; internal quotation marks omitted.) *State* v. *Smith*, 86 Conn. App. 259, 266, 860 A.2d 801 (2004); *State* v. *Wright*, 77 Conn. App. 80, 92, 822 A.2d 940, cert. denied, 266 Conn. 913, 833 A.2d 466 (2003); see also *State* v. *Smalls*, 136 Conn. App. 197, 203, 44 A.3d 866 (2012) (under Connecticut law both principals and accessories treated as principals), appeal dismissed, 312 Conn. 148, 91 A.3d 460 (2014) (certification improvidently granted).

Our Supreme Court has explained that "[t]o be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime . . . . In accordance with our murder statute, a conviction of murder as an accessory thus requires, inter alia, that the accessory shared the perpetrator's intent to cause the death of another person . . . . General Statutes § 53a-54a (a). A person acts intentionally with respect to a result . . . described by a statute defining an offense when his conscious objective is to cause such result . . . . General Statutes § 53a-3 (11)." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Bonilla*, supra, 317 Conn. 766; *State* v. *Robertson*, 254 Conn. 739, 783–84, 760 A.2d 82 (2000); see also *State* v. *Foster*, 202 Conn. 520, 525–26, 522 A.2d 277 (1987) (conviction under § 53a-8 requires proof of dual intent, i.e. that accessory has intent to aid principal and that in so aiding he intends to commit offense with which he is charged).

Similarly, a conviction of conspiracy to commit murder requires that the state prove that "there was an agreement between two or more persons to cause the death of another person and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . In addition, the state also must show that the conspirators intended to cause the death of another person." (Internal quotation marks omitted.) *State* v. *Mourning*, 104 Conn. App. 262, 267, 934 A.2d 263, cert. denied, 285 Conn. 903, 938 A.2d 594 (2007); *State* v. *Sanchez*, 84 Conn. App. 583, 588, 854 A.2d 778, cert. denied, 271 Conn. 929, 859 A.2d 585 (2004); see also *State* v. *Crump*, 43 Conn. App. 252, 259, 683 A.2d 402 ("[t]o prove the offense of conspiracy to commit murder, the state must prove two distinct elements of intent: that the conspirators intended to agree; and that they intended to cause the death of another person" [internal quotation marks omitted]), cert. denied, 239 Conn. 941, 684 A.2d 712 (1996); *State*

v. *Romero*, 42 Conn. App. 555, 558, 681 A.2d 354 (same), cert. denied, 239 Conn. 935, 684 A.2d 710 (1996).

2

The defendant focuses on two recent decisions from our Supreme Court in support of his insufficiency claim: *State* v. *Bennett*, supra, 307 Conn. 761, and *State* v. *Gonzalez*, 311 Conn. 408, 87 A.3d 1101 (2014).

In *State* v. *Bennett*, supra, 307 Conn. 774, our Supreme Court reversed the defendant's conviction of murder as an accessory on the ground that the state had failed to prove that he intended to kill the victim.[16] It specifically noted that in all accessorial liability cases, the defendant "had engaged in some act to prepare for, aid, encourage, facilitate or consummate the murder; it was from such acts that intent reasonably was inferred." Id., 768. Specifically, the defendant either inflicted or attempted to inflict harm on the victim, or otherwise participated in the murder by identifying the victim, taking the principal to the victim, distracting the victim and acting as a lookout to prevent interruption of the murder or assisting with the escape of the principal. Id., 769. The court specifically noted that "[o]ftentimes, evidence of a motive to kill had been established." Id. Additionally, the court in *Bennett* noted that the evidence revealed little about the defendant's actions at the most critical points in time, that is, prior to the defendant's arrival at the victim's apartment and the period of time after his arrival and prior to the shooting of the victim.[17] Id., 766.

At the same time, our Supreme Court recognized that "[o]ne who is present when a crime is committed but neither assists in its commission nor shares in the criminal intent of its perpetrator cannot be convicted as an accessory. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate, or consummate it." (Citation omitted; internal quotation marks omitted.) Id., 770.

In *State* v. *Gonzalez*, supra, 311 Conn. 408, also cited by the defendant, our Supreme Court concluded that there was no evidence that the defendant had commanded, directed, solicited, requested, or importuned the principal to shoot the victim.[18] Id., 421. It further commented that while "the defendant was by no means an innocent bystander in the chain of events that led to the victim's death, the evidence nevertheless is insufficient to prove his guilt beyond a reasonable doubt under an accessory theory of criminal liability." Id., 422.[19] We find that the defendant's reliance on *Bennett* and *Gonzalez* is misplaced because, unlike in those

cases, there is ample evidence here on which the jury could rely to reasonably infer his intent to kill the victim. Moreover, the evidence also supports a finding that far from being a passive actor, the defendant solicited Kunta's participation in the killing of the victim.

Before applying the reasoning of *State* v. *Gonzalez*, supra, 311 Conn. 408, and *State* v. *Bennett*, supra, 307 Conn. 758, to the present case, we must consider *State* v. *Bonilla*, supra, 317 Conn. 758, a case cited by the state. In that case, the defendant and his two brothers, Noel Bermudez and Victor Santiago, agreed to rob the victim, an individual against whom Santiago harbored a long-standing grudge. Id., 760. This resentment originated from a prior incident when the victim had shot Santiago, scarring his neck. Id.

The brothers drove to the victim's street and, working in concert, robbed and fatally shot him. Id. Following the shooting, the brothers returned to Santiago's home, where the defendant threatened to Santiago's wife that he would kill her and her mother if she discussed the shooting. Id., 761. The brothers destroyed the checks they had stolen, burned their clothes, and cleaned the getaway car to eliminate any incriminating evidence. Id.

The facts of *State* v. *Bonilla*, supra, 317 Conn. 758, are sufficiently similar to those of the present case to be persuasive. In *Bonilla*, our Supreme Court concluded that one brother's "long-standing grudge"; id., 760; against the victim, in combination with the evidence that the brothers acted in concert to "settle an old score" was sufficient for the jury to reasonably infer the intent to kill. Id., 768; cf. *State* v. *Bennett*, supra, 307 Conn. 766, 773 (defendant had no preexisting connection to victim and had no motive to kill victim independent of burglary).

As in *State* v. *Bonilla*, supra, 317 Conn. 758, the record here is replete with evidence from which the jury could reasonably infer that the defendant had the intent to kill the victim. He solicited Kunta's assistance in the shooting, and helped Kunta to locate and to identify the victim as manifested in the defendant's exchange with Robert Davis, the ongoing cell phone communications moments before and during the shooting in the school parking lot, the defendant's comments to Maxwell, Kunta's comments to Brown implicating the defendant, and Kunta's lack of motive or intent to kill the victim independent of the defendant's interest in revenge.

We iterate that intent is often inferred from a defendant's conduct and the events leading to and immediately following a victim's death, from the cumulative effect of circumstantial evidence and from the reasonable inferences drawn therefrom. *State* v. *Otto*, supra, 305 Conn. 66–67. Moreover, the "intent to kill may be inferred from evidence that the defendant had a motive

to kill." (Internal quotation marks omitted.) Id., 67; see also *State* v. *Bonilla*, supra, 317 Conn. 768; *State* v. *Ames*, 171 Conn. App. 486, 507–508, 157 A.3d 660, cert. denied, 327 Conn. 908, 170 A.3d 679 (2017); *State* v. *Moye*, 119 Conn. App. 143, 149, 986 A.2d 1134, cert. denied, 297 Conn. 907, 995 A.2d 638 (2010); *State* v. *Aviles*, 107 Conn. App. 209, 217, 944 A.2d 994, cert. denied, 287 Conn. 922, 951 A.2d 570 (2008).

We conclude that the state built a chain of inferences establishing, beyond a reasonable doubt, that the defendant's conduct on the morning of July 10, 2013, was not passive acquiescence but rather active involvement, demonstrating a shared intent to cause the death of the victim. See, e.g., *State* v. *Bonilla*, supra, 317 Conn. 768–69 (defendant's brother had long-standing hatred of victim and it was fair inference that brothers united in that hatred and sought revenge against victim; banding of brothers afforded strength in numbers to settle old score; and defendant acted as lookout, an active participant in murder, all of which amounted to evidence of intent to kill); *State* v. *Grant*, 149 Conn. 41, 49, 87 A.3d 1150 (defendant lured victim into car, which constituted evidence of intent to aid principal in murder), cert. denied, 312 Conn. 907, 93 A.3d 158 (2014); *State* v. *Ashe*, 74 Conn. App. 511, 518–20, 812 A.2d 194 (evidence that defendant and fellow gang members engaged in concert of action provided sufficient basis for accessorial liability), cert. denied, 262 Conn. 949, 817 A.2d 108 (2003); see generally *In re David M.*, 29 Conn. App. 499, 504–505, 615 A.2d 1082 (1992) (evidence was clear that respondent was neither passively acquiescent nor acting in innocent fashion where he operated car to prevent victim from escaping and to assist shooter). Accordingly, we conclude that the evidence was sufficient for the jury to find that the defendant intended to kill the victim, a necessary element of murder as an accessory and conspiracy to commit murder.

B

The defendant next argues that there was insufficient evidence to support his conviction of murder as an accessory because the "record contains no evidence of words or other conduct that amounted to the defendant commanding, directing, soliciting, requesting, or importuning [Kunta] to shoot the victim." (Internal quotation marks omitted.) We disagree.

"To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime *and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it*." (Emphasis added; internal quotation marks omitted.) *State* v. *Sargeant*, 288 Conn. 673, 680, 954 A.2d 839 (2008); see also *State* v. *Gonzalez*, supra, 311 Conn. 424; *State* v. *Martinez*, 278 Conn. 598, 615, 900 A.2d 485 (2006); see also *State* v. *Kerr*, 107 Conn. App. 413,

421–22, 945 A.2d 1004 (mere knowledge that crime is going to be committed is insufficient to establish liability as accessory if defendant does not encourage or intentionally aid in commission of crime), cert. denied, 287 Conn. 914, 950 A.2d 1290 (2008).

Having reviewed the evidence in the record, we conclude that the state produced sufficient evidence from which the jury reasonably could infer that the defendant knowingly and wilfully assisted Kunta in the acts which prepared for and facilitated the crime of murder. As we previously stated in part I A 2 of this opinion, the jury reasonably could infer that the defendant had the intent to kill the victim from the following facts: the defendant had a motive to seek revenge against the victim; the defendant and Kunta twice actively searched for the victim; upon locating the victim, the defendant called Kunta and requested his help; the victim told the Davises that more than one person was trying to kill him; the defendant appeared at the Davises' residence moments after the victim left and asked if someone had gone through the residence; Kunta, who had no knowledge of or history with the victim, identified the victim from a description provided by the defendant; the defendant's comments to Maxwell that attempted to hide the events from a potential witness or to facilitate Kunta's escape from the scene by delaying or preventing a call to the police; Kunta's comments to Brown after the shooting and Kunta's statement to police following his return to Connecticut. These same facts from which the defendant's intent to kill can be inferred also support the jury's finding that the defendant knowingly assisted Kunta with the killing of the victim. Therefore, this claim of evidentiary insufficiency must fail.

C

The defendant next argues that there was insufficient evidence to support his conviction of conspiracy to commit murder because the state failed to show that an agreement existed between Kunta and the defendant to cause the death of the victim. We disagree.

"To establish the crime of conspiracy [to commit murder, the state must show] that *an agreement was made between two or more persons to engage in conduct constituting* [*the crime of murder*] and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . While the state must prove an agreement [to commit murder], the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can

seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *King*, 116 Conn. App. 372, 378–79, 976 A.2d 765, cert. denied, 294 Conn. 912, 983 A.2d 274 (2009); *State* v. *Mourning*, supra, 104 Conn. App. 267–68.

The defendant argues that there is "next to no evidence to support a finding of a knowing agreement between the defendant and Kunta to engage in a forbidden act. The only agreement the jury could reasonably infer from the evidence presented was an agreement to meet in the area of Vine Street. That is not an illegal act." We disagree.

The facts we have set forth in more detail previously in this opinion constitute evidence from which the jury reasonably could infer that an agreement existed, including the defendant's motive; his communications with Kunta; their searches for the victim; the defendant's exchanges with Davis and Maxwell, and his statements to the police; Kunta's statements to Brown and to the police; Kunta's own lack of motive and knowledge of the victim; and the victim's statements to the Davises. We conclude that the foregoing evidence was sufficient to establish that the defendant and Kunta had entered into an agreement to cause the death of the victim. Such an agreement often is inferred from the separate acts and the activities of the accused persons. *State* v. *Grant*, supra, 149 Conn. App. 46-47; see also *State* v. *Bell*, 68 Conn. App. 660, 669, 792 A.2d 891 ("[i]n a conspiracy prosecution, when determining both a defendant's specific intent to agree and his specific intent that the criminal acts be performed, the jury may rely on reasonable inferences from facts in the evidence and may develop a chain of inferences, each link of which may depend for its validity on the validity of the prior link in the chain" [internal quotation marks omitted]), cert. denied, 260 Conn. 921, 797 A.2d 518 (2002). Accordingly, we conclude that the defendant's claim of insufficient evidence with respect to his conviction of conspiracy to commit murder is without merit.

## II

The defendant next claims that the court's improper jury instructions violated his right to a fair trial. Specifically, the defendant argues that the court failed to inform the jury that it was not permitted to rely on Kunta's testimony that he had pleaded guilty to murdering the victim to prove that a murder occurred. The defendant further contends that the court's statement that "[i]n this case, the murder was committed by another individual, Kunta Soyini, who was the principal offender in the murder," amounted to a directed verdict, or, in the alternative, a dilution of the state's burden to prove that a murder in fact had occurred. The defendant concedes that this claim was unpreserved, but requests

review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[20] We disagree with the defendant's claim.

The following additional facts are necessary for our discussion. During the state's case, the prosecutor called Kunta as a witness. He testified that he had shot and killed the victim on July 10, 2013. He also admitted that he had pleaded guilty to the charge of murder as it related to that shooting and currently was serving a prison sentence. On cross-examination, Kunta stated that he did not go to the school parking lot with the intent to kill anyone, and that the defendant did not ask him to kill anyone, did not ask for his help to kill anyone and did not encourage him to kill anyone. Kunta also noted that his decision to kill the victim arose when he panicked after the victim "made a move
. . . ."

During its instructions to the jury, the court addressed the issue of accomplice testimony. Additionally, it informed the jury that Kunta's conviction of murder was "only admissible on the question of the credibility of the witness, that is, the weight that you will give the witness' testimony. The witness' criminal record bears only on his—on this witness' credibility."

The court then discussed the state's burden to prove each element of the crimes as well as the identity of the defendant as the perpetrator of the crimes. With respect to the crime of murder, the court instructed that the state was required to prove that the defendant had intended to cause the death of the victim and, in accordance with that intent, had caused the death of the victim. The court iterated these elements when it discussed the crime of accessory to murder. It also stated that the murder was committed by someone besides the defendant, specifically, Kunta, the principal in this case. The court similarly instructed the jury with respect to the charge of conspiracy to commit murder.

As noted previously, the defendant did not preserve this challenge to the court's instructions. He requests review, inter alia, pursuant to the *Golding* doctrine.[21] "It is well established that [t]his court is not bound to review claims of error in jury instructions if the party raising the claim neither submitted a written request to charge nor excepted to the charge given by the trial court. . . . Under *Golding*, a defendant may prevail on an unpreserved claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Citations omit-

ted; internal quotation marks omitted.) *State* v. *Frasier*, 169 Conn. App. 500, 505–506, 150 A.3d 1176 (2016), cert. denied, 324 Conn. 912, 153 A.3d 653 (2017). We conclude that the defendant's claim fails under the third prong of *Golding*.

Our standard of review is well established. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . .

"It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged. . . . The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. . . . Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are. . . .

"[I]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . The test is whether the charge as a whole presents the case to the jury so that no injustice will result. . . . We will reverse a conviction only if, in the context of the whole, there is a reasonable possibility that the jury was misled in reaching its verdict. . . . A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. . . . An instruction that fails to satisfy these requirements would violate the defendant's right to due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. . . . The test of a charge is whether it is correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . The primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established. . . . The purpose of a charge is to call the attention of the members of the jury, unfamiliar with legal distinctions, to whatever is necessary and

proper to guide them to a right decision in a particular case." (Internal quotation marks omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 287–89, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016); *State* v. *McNeil*, 154 Conn. App. 727, 748, 106 A.3d 320, cert. denied, 316 Conn. 908, 111 A.3d 884 (2015).

In his appellate argument, the defendant focuses on (1) the absence of an instruction that the jury could not use Kunta's guilty plea to find that the crime of murder had been proven beyond a reasonable doubt and (2) the court's specific statement that the murder had been committed by a person other than the defendant. Our Supreme Court, in *State* v. *Just*, 185 Conn. 339, 347–48, 441 A.2d 98 (1981), stated: "The fact that one or more persons jointly charged with the commission of a crime pleaded guilty is not admissible on the trial of another person so charged, to establish that the crime was committed. . . . This is so because a plea of guilty is, in effect, merely a confession of guilt, which, having been made by one of those charged with the crime, can be no more than hearsay as to another who is so charged. . . . After we decided [*State* v. *Pikul*, 150 Conn. 195, 198, 187 A.2d 442 (1962)], we had occasion to point out that *Pikul* stands for the principle that the guilty plea of one or more persons jointly charged with a crime cannot be admitted in the trial of another so charged to establish that the crime was committed. . . . *State* v. *DellaCamera*, 166 Conn. 557, 565, 353 A.2d 750 (1974) . . . . While such evidence may be offered to affect credibility . . . or for some permitted limited purpose, we believe a proper cautionary instruction to the jury should be given, generally upon objection overruled or sua sponte where the court views the potential for prejudice as likely." (Citations omitted; internal quotation marks omitted.)[22] See also *State* v. *Butler*, 55 Conn. App. 502, 510–11, 739 A.2d 732 (1999), aff'd, 255 Conn. 828, 769 A.2d 697 (2001).

The defendant's argument, however, fails to account for the entirety of the jury instructions. The court informed the jury that the state was required to prove each element of the crimes charged beyond a reasonable doubt. It iterated that "the state must prove each element of the offense, *including identification of the defendant*, beyond a reasonable doubt." (Emphasis added.) It limited the jury's use of Kunta's testimony regarding his conviction of murder to the determination of his credibility. The court further instructed that the state had to prove that the defendant "was the perpetrator of the crime" and that the jury had to determine the intent of the defendant. With respect to its definition of murder, the court noted that the state had to prove that the "defendant's conduct was the proximate cause of the [victim's] death. You must find it proved beyond a reasonable doubt that [the] victim died as a result of the actions of the defendant." In summarizing this offense, the court stated: "[F]or the crime of murder,

the state must prove beyond a reasonable doubt that, one, the defendant intended to cause the death of another person; two, in accordance with that intent, the defendant caused the death of that person." This statement essentially was repeated during the court's discussion of the crime of accessory to murder. At the conclusion of that part of the instructions, the court specifically stated: "[Y]ou must unanimously find that the state has proved beyond a reasonable doubt that the defendant assisted another to commit the crime of murder. You must also unanimously find beyond a reasonable doubt that the defendant had the intent to commit the crime charged and did solicit, request, command, importune or intentionally aid another in the commission of the crime of murder." Finally, the court similarly instructed the jury with respect to the crime of the conspiracy to commit murder.

Having considered the charge as a whole, we are not convinced that the absence of an instruction that the jury could not use Kunta's guilty plea to find that the crime of murder had been proven beyond a reasonable doubt and the court's specific statement that Kunta was the principal offender in the murder misled the jury. In our view, the court's instructions provided the jury with a clear understanding of the elements of the crimes charged, including whether the defendant was the perpetrator, and afforded proper guidance for the jury's determination of whether those elements were proved by the state. We emphasize that "[i]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 452, 988 A.2d 167 (2009). Mindful of this standard, we conclude that the jury could not have been misled by the court's instructions. Accordingly, the defendant cannot prevail on this claim under the third prong of *Golding* because he has not established that a constitutional violation exists that deprived him of a fair trial. This claim, therefore, must fail.

### III

The defendant finally claims that the court committed plain error by giving a special credibility instruction on accomplice testimony, which was unwarranted in this case. The defendant concedes that this claim was not preserved at trial and is not of constitutional magnitude, but argues that we should reverse his conviction under the plain error doctrine. See Practice Book § 60-5.

We disagree.

The following additional facts are necessary for our discussion. In its instructions to the jury, the court stated: "Accomplice testimony. In weighing the testimony of an alleged accomplice who is a self-confessed criminal, Kunta Soyini, you should consider that fact. It may be that you would not believe a person who has committed a crime as readily as you would believe a person of good character. He may have such an interest in the outcome of this case that his testimony may have been colored by that fact. Therefore, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it. There are many offenses that are of such a character that the only persons capable of giving useful testimony are those who are themselves implicated in the crime. It is for you to decide what credibility you will give to a witness who has admitted his involvement in a criminal wrongdoing, whether you will believe or disbelieve the testimony of a person who, by his own admission, has committed or contributed to the crimes charged by the state here. Like all questions of credibility, this is a question you must decide based on all the evidence presented to you."

"Generally, a defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely. . . . An exception to this rule, however, involves the credibility of accomplice witnesses. . . . [W]here it is warranted by the evidence, it is the court's duty to caution the jury to scrutinize carefully the testimony if the jury finds that the witness intentionally assisted in the commission, or if he assisted or aided or abetted in the commission, of the offense with which the defendant is charged. . . . The court's duty to so charge is implicated only where the trial court has before it sufficient evidence to make a determination that there is evidence that the witness was in fact an accomplice." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Walker*, 178 Conn. App. 345, 351–52, 175 A.3d 576 (2017), cert. denied, 327 Conn. 999,     A.3d (2018); see also *State* v. *Jackson*, 178 Conn. App. 16, 26, 173 A.3d 974 (2017), cert. denied, 327 Conn. 998,     A.3d     (2018); *Martin* v. *Commissioner of Correction*, 155 Conn. App. 223, 230–31, 108 A.3d 1174, cert. denied, 316 Conn. 910, 111 A.3d 885 (2015).

In the present case, the defendant argues that the court's special instruction regarding accomplice testimony was unwarranted. Specifically, he argues that because Kunta already had pleaded guilty and had been sentenced for the murder of the victim, "[h]e had no hope of obtaining favorable treatment from the state in exchange for his testimony . . . nor did he inculpate the defendant . . . ." (Citations omitted.)

As we noted previously, this claim was not preserved

and is not of constitutional magnitude; accordingly, the defendant relies on the plain error doctrine. "It is well established that the plain error doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007)], we described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 595–97, 134 A.3d 560 (2016).

The defendant has not demonstrated that the court's accomplice instruction constituted an error that "was so clear, obvious and indisputable as to warrant the

extraordinary remedy of reversal" as required under our plain error analysis. (Internal quotation marks omitted.) *State* v. *Jackson*, supra, 178 Conn. App. 24. Additionally, even if we were to assume such error existed, we are not persuaded that the accomplice instruction in the present case constituted manifest injustice. Id. Simply stated, the defendant has failed to demonstrate that the court's accomplice instruction "was of such monumental proportion that it threatened to erode our system of justice . . . or that it resulted in harm so grievous that fundamental fairness requires a new trial." (Citation omitted; internal quotation marks omitted.) Id., 29. Accordingly, we conclude that this claim of plain error is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aides another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] Specifically, Quincy testified that the defendant had told him that the victim, accompanied by another individual, had "put a gun in front of [the defendant's] face, and he took him for a little weed and the money."

[5] Specifically, Kunta testified: "I was driving down Magnolia Street, and I looked to my right. And I seen somebody walking through the [school] parking lot that matched the description that [the defendant] gave me."

[6] The following colloquy occurred during Kunta's testimony on direct examination by the prosecutor:

"Q. And did you know that the—the kid [that the defendant] was looking for, did you know who that kid was?

"A. No.

"Q. Had you had any beefs with that kid?

"A. No.

"Q. All right. And I'm gonna show you what's been marked state's exhibit 46. See if you recognize that kid. Do you recognize him?

"A. No.

"Q. Okay. To this day, do you know who the kid was that you shot?

"A. No."

Subsequently on redirect examination, Kunta agreed with the prosecutor that he did not know the victim and did not have "any beefs" with him. He also admitted that he loved the defendant and would do anything for him. Finally, Kunta stated on cross-examination that he went to the area only because the defendant had called him "for my help."

[7] According to the time-stamp from the video recording of the school parking lot, the victim sat between the two cars at 10:18:47 a.m.

[8] The events depicted on the video recording of the school parking lot contradict parts of Kunta's testimony regarding his interactions with the victim at this time in the parking lot. Specifically, Kunta testified: "I walked through the parking lot. And as I got up by the cars, the parked cars, I seen somebody sitting down between two parked cars. And I approached the guy, and I asked—asked him what his name was. And he just looked at me. So, I reached in my pocket and got—and grabbed my phone to call [the defendant] and see if this was the guy they were looking for or whatever. And the guy walked toward me. Just stay right there.

"And then he walked toward me again, and that's when I pulled out— pulled my gun out. And that time he, like, half turned body away from me.

And I thought he was making a move, so I started shooting at him and chasing him."

It is axiomatic that "[a] jury may properly decide, however, what—all, none or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Steele*, 176 Conn. App. 1, 12, 169 A.3d 797, cert. denied, 327 Conn. 962, 172 A.3d 1261 (2017); *State* v. *Young*, 174 Conn. App. 760, 767, 166 A.3d 704, cert. denied, 327 Conn. 976, 174 A.3d 195 (2017).

[9] According to the time-stamp from the video recording of the school parking lot, the defendant appeared at 10:19:44 a.m.

[10] Maxwell further described the defendant's attitude in the school parking lot as "like a day at beach" and that there was "[n]o need for concern."

[11] Kunta testified that he shot at the victim in self-defense, both in the school parking lot and when the victim unsuccessfully attempted to climb over a gate. We have detailed the events of the former previously in this opinion. See footnote 8 of this opinion. With respect to the latter, Kunta stated: "He tried to jump a gate, and I just stood there and watched him. And he couldn't get over the gate. So, when he fell back down, he turned around and faced me, and he—he picked up, like, this—like, this big log or something. I told the dude, let's just chill. Let's stay right there. And then he started screaming real loud and ran at me. And that's when I shot him in the chest."

As we have noted, the jury is free to accept or to reject all, some or none of a witness' testimony. *State* v. *Steele*, 176 Conn. App. 1, 12, 169 A.3d 797, cert. denied, 327 Conn. 962, 172 A.3d 1261 (2017); *State* v. *Young*, 174 Conn. App. 760, 767, 166 A.3d 704, cert. denied, 327 Conn. 976, 174 A.3d 195 (2017).

[12] Susan Williams, an associate medical examiner for the state, testified that the victim died as a result of a gunshot wound to the chest.

[13] Fargnoli testified that there were five telephone calls between the defendant and Kunta on July 10, 2013. The first call was from the defendant to Kunta at 10:13 a.m. and lasted approximately three and one-half minutes. The second call was from Kunta to the defendant at 10:17 a.m., and lasted just over two minutes. The third call, made at 10:20 a.m., was from the defendant to Kunta and had no duration, while the fourth call, which also occurred at 10:20 a.m., was from Kunta to the defendant for six seconds. The fifth and final call, which took fourteen seconds, was from the defendant to Kunta at 10:21 a.m. Fargnoli also indicated that the 911 call in this case occurred at 10:17 a.m.

[14] The jury reasonably could have concluded that the defendant lied to the police with respect to his statements that Kunta had telephoned him first and that he did not know the victim.

[15] "We begin with this issue because if the defendant prevails on the sufficiency claim, [he] is entitled to a directed judgment of acquittal rather than to a new trial." *State* v. *Moore*, 100 Conn. App. 122, 126 n.2, 917 A.2d 564 (2007).

[16] In *State* v. *Bennett*, supra, 307 Conn. 761, the defendant and the principal, in possession of loaded handguns, drove to the second floor apartment of the victim and his girlfriend. The principal knocked on the front door, engaged the victim in a brief conversation, and then shot him in the face. Id.

[17] In contrast to the facts of the present case, the defendant in *Bennett* had met the victim only hours before the fatal shooting. *State* v. *Bennett*, supra, 307 Conn. 761.

[18] In *State* v. *Gonzalez*, supra, 311 Conn. 411–12, the victim, after observing a drug sale in his mother's apartment building on Christmas night, exchanged words with the defendant and the principal. The defendant pointed a handgun at the victim, and a struggle ensued. Id., 412. The principal picked up the handgun, which had fallen to the floor, and shot the victim twice, causing his death. Id., 412–13.

[19] We further note that our Supreme Court focused on the insufficiency of the evidence with respect to whether the defendant had "acted as [the principal's] accessory" rather than whether he had shared the intent to kill the victim. *State* v. *Gonzalez*, supra, 311 Conn. 421.

[20] The defendant also requested that if we were to conclude that his claim is not reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, then the plain error doctrine requires a reversal of his conviction. See Practice Book § 60-5. Finally, he contends that "if this court finds that the claim was waived and that it does not satisfy the requirements of the plain error doctrine, it should nevertheless exercise its supervisory authority to remand for a new trial and to instruct trial courts that the testimony of a convicted coconspirator or accomplice should be accompanied by an appropriate limiting instruction." See *State* v. *Elson*, 311 Conn. 726, 764–66,

91 A.3d 862 (2014). Because we have considered the claim under *Golding*, we need not employ these extraordinary tools for review.

[21] The state argues that the defendant waived this claim and, therefore, it is not reviewable under the *Golding* doctrine. "It is well established in Connecticut that unpreserved claims of improper jury instructions are reviewable under *Golding* unless they have been induced or implicitly waived. *State* v. *Kitchens*, [299 Conn. 447, 468, 10 A.3d 942 (2011)]. . . . [W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." (Citations omitted; internal quotation marks omitted.) *State* v. *Herring*, 151 Conn. App. 154, 169–70, 94 A.3d 688 (2014), aff'd, 323 Conn. 526, 147 A.3d 653 (2016).

In the present case, the record reveals that the court did not provide the parties with a draft of the complete jury instructions until the morning of July 6, 2015. At that point, the parties then reviewed the instructions page by page with the court. The defendant argues, therefore, that the timing in this case prevented counsel from engaging in a "meaningful review" of the court's instructions. We have recognized that a meaningful review requires the opportunity to review the proposed instructions overnight. *State* v. *Leach*, 165 Conn. 28, 33, 138 A.3d 445, cert. denied, 323 Conn. 948, 169 A.3d 792 (2016). We conclude, therefore, that the defendant was not afforded a meaningful opportunity to review the proposed instructions in this case and, thus, did not implicitly waive the right to challenge them pursuant to *Kitchens*.

[22] We note, however, that our Supreme Court further reasoned that "[t]he lack of a curative instruction, especially in the absence of objection and a request for one, does not necessarily constitute harmful error." *State* v. *Just*, supra, 185 Conn. 348–49. Specifically, the court considered the fact that testimony of the accomplices established their guilt as well as that of the defendant, rendering any prejudice from the testimony regarding the pleas harmless. Id., 349. It also took into account the absence of a claim from the defendant that the evidence of the accomplices' guilty pleas had been highlighted by the state, as well as the entirety of the court's instructions to the jury. Id., 350–51.

---