NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 79

No. 24-AP-083

In re Samantha Granger

Original Jurisdiction

Board of Bar Examiners

September Term, 2024

Kevin Gustafson of Mountain View Law, PLLC, Killington, for Petitioner-Appellant.

Charity R. Clark, Attorney General, and Ryan P. Kane, Deputy Solicitor General, Montpelier, for Respondent-Appellee.

PRESENT: Reiber, C.J., Eaton, Cohen and Waples, JJ., and Johnson, J. (Ret.), Specially Assigned

¶ 1. **REIBER, C.J.** Applicant appeals from the denial of her request for admission to the Vermont Bar through a transferred Uniform Bar Examination (UBE) score pursuant to Rule 13 of the Vermont Rules of Admission to the Bar. Applicant obtained a passing score on the UBE in Maine in July 2023 on her sixth UBE attempt. The Board of Bar Examiners found that applicant failed to satisfy Rule 13(c), which requires that a UBE score be "achieved within no more than 4 sittings for the UBE." Applicant asks this Court to read a waiver provision into Rule 13(c) and to admit her to practice in Vermont. We agree with the Board that the rule does not allow for a waiver of the 4-sittings requirement and we therefore affirm the Board's decision.

¶ 2. As indicated above, Rule 13 governs admission to the Vermont Bar by transferred UBE score. In addition to other requirements, Rule 13(c) requires that a passing score be "achieved

within no more than 4 sittings for the UBE," and "[f]or purposes of this rule, attempts to achieve the required score count toward the limit of 4 regardless of where the Applicant sat for the UBE."

¶ 3.    For admission-by-examination applicants testing in Vermont, the rules similarly prohibit an applicant "who has failed the bar examination four times . . . to sit for the UBE in Vermont." V.R.A.B. 9(b)(4). Rule 9(b)(4) expressly allows for a waiver of this requirement, however, "upon a strong showing, to the Board's satisfaction, that the Applicant has substantially improved [the Applicant's] Exam preparation and there is good cause warranting the requested waiver."

¶ 4.    The record indicates the following. Applicant graduated from law school in 2018. She unsuccessfully sat for the bar examination in Vermont in July 2018 and February 2019; Alaska in February 2020; Vermont in February 2021; and Vermont in July 2021 pursuant to a waiver granted by the Board under Rule 9(b)(4) for a fifth attempt. Applicant indicates that she did not think it would be feasible for her to sit for the exam again in Vermont and she therefore took the July 2023 bar examination in Maine. Maine does not limit the number of times in which an individual may sit for the bar. See Maine Bar Admission Rules, Rule 10. Applicant achieved a passing score on the UBE (at or above Vermont's cutoff score) and was sworn in as an attorney in Maine in October 2023.

¶ 5.    In December 2023, applicant sought admission in Vermont by transferred UBE score. She asked the Board to waive several requirements in Rule 13, including that a passing score be "achieved within no more than 4 sittings for the UBE." V.R.A.B. 13(c). In a letter to the Board, applicant argued that her unique circumstances and qualifications warranted an exception to this and several other requirements. In support of her application, she submitted affidavits from others respecting her professional qualifications as an attorney.

¶ 6.    The Board considered applicant's request for admission at a March 2024 meeting. It denied the request because applicant did not satisfy the four-attempt limit in Rule 13(c). The

2

Board acknowledged that applicant sought a waiver of this requirement but found that the rule did not provide for a waiver. Applicant appealed to this Court.

¶ 7.     Applicant argues on appeal that this Court should read an implied waiver provision into Rule 13(c). She notes that there are waiver provisions in other subsections of Rule 13 and in other rules. Applicant contends that the absence of an express waiver in Rule 13(c) is the result of oversight rather than a purposeful choice. She cites <u>Sarazin v. Board of Bar Examiners</u>, 161 Vt. 364, 365, 639 A.2d 71, 71 (1994), to argue that reading an implied waiver provision into the rule is appropriate here. Applicant further contends that it would be contrary to public policy not to read a waiver provision into the rule. Assuming the Board lacks authority to waive Rule 13(c), applicant asks this Court to waive the rule and to admit her sui generis.

¶ 8.     We find these arguments unpersuasive. "In interpreting a court rule, we generally employ tools similar to those we use in statutory construction." <u>In re Oden</u>, 2018 VT 118, ¶ 8, 208 Vt. 642, 202 A.3d 252 (quotation omitted). Thus, "we look first to the rule's plain language, and we construe it as a whole, looking to the reason and spirit of the law and its consequences and effects to reach a fair and rational result." <u>Id</u>. (quotation omitted). The plain language of Rule 13 does not allow for a waiver, and we decline to read such a provision into the rule's plain language.

¶ 9.     The Rules of Admission to the Bar are designed "to ensure that attorneys granted admission to practice in Vermont meet our standards for professional competence." <u>Id</u>. ¶ 3. As stated in Rule 1, "[t]he public interest is best . . . maintained when applicants for admission are fairly, impartially, and thoroughly examined as to their professional competence as attorneys." To this end, the Court "established the Board of Bar Examiners to assess professional competence," and "committed to the Board the 'duty to determine whether each Applicant has made the necessary showing of Minimal Professional Competence in accordance with these rules warranting the Applicant's admission to the Bar to engage in the practice of law.' " <u>Id</u>. (quoting V.R.A.B. 1, 3(b)).

¶ 10. "Bar examinations have a rational connection with the applicant's fitness or capacity to practice law." Poats v. Givan, 651 F.2d 495, 497 (7th Cir. 1981) (per curiam). We have recognized that limiting the number of times that one can sit for the Vermont Bar is rationally connected to the Court's "obligation to protect the public by ensuring professional competence." Oden, 2018 VT 118, ¶ 10. Other courts have similarly concluded that limits on the number of attempts to pass the bar examination are "rationally related to the state's legitimate interest in ensuring the competency of its bar." Jones v. Bd. of Comm'rs of Ala. State Bar, 737 F.2d 996, 1002 (11th Cir. 1984); see, e.g., Younger v. Colo. State Bd. of L. Exam'rs, 625 F.2d 372, 377 (10th Cir. 1980) (reaching similar conclusion and observing that "[d]espite final success, earlier failures might well be of concern to the State" with respect to "competence and ability to practice law," and referencing "low pass rate for persons taking a fourth examination" as additional support for this conclusion); Poats, 651 F.2d at 498-500 (concluding Indiana acted within its constitutional authority by limiting number of times applicant could take bar examination to four and limit had "rational connection to the applicant's fitness and capacity to practice law").

¶ 11. In Jones, the court rejected the argument that "passage of the examination, regardless of the number of previous attempts, indicates that the successful examinee has attained the required level of competence." 737 F.2d at 1001. It noted that "repeated failure in itself may reflect upon a person's competency to practice law and legitimately may be considered by a state in establishing the standards for admission to its bar." Id. The court also cited evidence regarding "the extremely low pass rates among those taking a bar examination for the fourth or fifth time." Id. (citing Poats, 651 F.2d at 499); see also Younger, 625 F.2d at 377. The Jones court reasoned that:

> Although a person may undertake several periods of intensive study and, after several unsuccessful attempts to pass the bar, become familiar enough with the form of the examination as well as the substantive areas covered by the examination questions to pass the test, a state nevertheless may conclude that this individual has

4

not displayed adequate ability to handle the everyday problems and pressures of a legal practice, where repeated failures, even if ultimately followed by success, can seriously injure the rights and interests of the public.

737 F.2d at 1001-02. The court thus "conclude[d] that the limitation on the number of times one can sit for the Alabama bar examination [was] rationally related to the state's legitimate interest in ensuring the competency of its bar." Id. at 1002; see also Younger, 625 F.2d at 377 (concluding "success on the examination" is not necessarily "an absolute determinant of capacity," and State may take into account "other concerns of possible fundamental deficiencies in a repeating examinee," and "[d]espite final success, earlier failures might well be of concern to the State" regarding an "individual's lack of competence and ability to practice law"). In light of this, we reject applicant's assertion that applying Rule 13's strict limitation on UBE attempts is contrary to public policy.

¶ 12. We are equally unpersuaded by applicant's reliance on Sarazin. In Sarazin, an applicant sought to waive a requirement that four-year clerkship applicants for the Vermont Bar pursue their clerkships only at firms located in Vermont. The applicant had completed part of her clerkship under the supervision of a Vermont licensed attorney at a law office in Lebanon, New Hampshire. We determined there that a waiver should be available, notwithstanding the absence of waiver language in the rule. In reaching our conclusion, we noted that waiver provisions existed in other bar-admission rules, which we determined "evince[d] a recognition that case-by-case determinations may be necessary in order to assure fair treatment of applicants who present unusual or extraordinary circumstances." Sarazin, 161 Vt. at 367, 639 A.2d at 72. We also observed that the rule "governing the clerkship requirement for an attorney seeking admission on motion from another jurisdiction . . . require[d] only that the applicant perform a clerkship with an attorney practicing in this state," and it did not require "that the attorney's office be located within this state." Id. at 367-68, 639 A.2d at 72-73 (quotation omitted).

5

¶ 13. We considered the possibility of a waiver warranted in <u>Sarazin</u> because a "bright line rule" would prevent the applicant "from qualifying for a four-year clerkship when, all other things being equal, the only difference in her situation from that of other four-year clerks [was] her location outside the state." <u>Id</u>. The Court agreed with the applicant that "the quality of the supervision provided by a law firm [was] not necessarily a function of its geographic location," and reasoned that "the use of a 'bright line' rule, with no consideration being given to an applicant's compliance with other essential requirements of the rules, could lead to unreasonable results." <u>Id</u>. We added that "multi-state practices [were] not uncommon along Vermont's borders," and that it was not necessarily true that "a Vermont firm will afford a clerk more or better exposure to Vermont law simply by virtue of its physical location in Vermont." <u>Id</u>. at 367, 639 A.2d at 72. We thus held "that, for good cause shown, the Board [could] waive the in-state requirement" of the rule. <u>Id</u>. at 368, 639 A.2d at 73. As part of our decision, we "invite[d] the Board to recommend an amendment to the rules consistent with" this holding, and we reversed and remanded the case to the Board to consider the "applicant's request for a waiver of the requirement that she clerk with an attorney within this state." <u>Id</u>. (quotation omitted).

¶ 14. We later characterized our decision in <u>Sarazin</u> as based on "extraordinary circumstances." <u>Parks v. Bd. of Bar Exam'rs</u>, 2005 VT 66, ¶ 7, 178 Vt. 599, 878 A.2d 297 (mem.) ("We have . . . exercised our authority on at least one occasion to waive a bar rule in extraordinary circumstances."). In <u>Parks</u>, an applicant seeking admission by motion argued that the Board should have "waived adherence to the rule" requiring him to have "engaged in the practice of law for five of the preceding ten years." <u>Id</u>. ¶¶ 2, 6. He wanted the Board to focus on his earlier experience practicing law. The Court concluded that "the focus on the ten-year period immediately preceding the application serve[d] the important public interest of ensuring that the applicant remains currently competent and in good standing not only through active practice but also through compliance with any continuing legal education requirements and disciplinary rules of the other

jurisdiction." Id. ¶ 6. It considered "[t]he ten-year timeframe . . . a generous but reasonable means of assuring that the applicant has achieved and maintained the skills and fitness required for the practice of law." Id. The Court thus held that the Board did not err in applying the rule as written. Id. ¶ 7. It noted that the Court had not "previously waived a time requirement for admission on motion under the rules," and it "[did] not believe that this case present[ed] such an extraordinary situation that the otherwise salutary rule requiring active practice for at least five of the preceding ten years should be relaxed." Id.

¶ 15. We reach a similar conclusion here. It is appropriate to enforce the rule as written. While we note there are impressive particulars attached to applicant's petition for licensure, waiver of the black-letter rule is a step we cannot take. No extraordinary circumstances warrant the addition of a waiver provision outside our normal processes. Many applicants face financial and personal circumstances that may affect their ability to achieve a passing score on the UBE. The public interest is served by adhering to the plain language of Rule 13, which ensures predictability and fairness for all applicants. We are not persuaded by applicant's assertion that as in Sarazin, "all other things being equal," her professional capability is not significantly distinguishable from a UBE-transferred-score applicant who achieved a passing score on one of the first four attempts. The plain language of the Rule 13 evinces a contrary intent and we have determined that the four-attempt limit is rationally connected to ensuring the competence of the Vermont Bar.

¶ 16. It is reasonable, moreover, to conclude that the rules—which on the one hand allow for the possibility of a waiver under Rule 9 for applicants sitting for the UBE in Vermont, but on the other do not allow for a waiver under Rule 13—are not conflicting. Under Rule 9, the Board has the opportunity to assess, prior to the exam, whether an applicant has met the showing required under Rule 9(b)(4). The Board cannot engage in a pre-exam assessment when an applicant seeks to gain admission through a transferred score under Rule 13.

¶ 17.    Applicant argues that she has already demonstrated her professional capacity based on her graduation from law school, her work experience in the legal field, and the fact that she met the Vermont cutoff scores for the UBE and the Multistate Professional Responsibility Exam. Applicant further asserts that Rule 13 should account for individual circumstances and professional capacity.  Allowing for waivers, she argues, is essential to fairness and justice in attorney licensing and will promote diversity and inclusivity.  She notes the large debt load many law students carry and its effect on stress and anxiety levels, as well as the anxiety that can accompany high-stakes testing.  She argues that the rules should prioritize an assessment of professional capacity and asserts that the adoption of the NextGen bar examination illustrates a trend in this direction.

¶ 18.    These arguments are best directed toward the Board's formal rulemaking process. See A.O. 11.  The formal rulemaking process allows for a full discussion of whether it makes sense to create a waiver for the four-attempt limit and what might constitute "good cause" for such a waiver to ensure that any exception does not swallow the rule.  Under established principles of construction, courts will add language to a provision in "very limited circumstances including where necessary 'to avoid repugnancy or inconsistency with legislative intent' or where 'words obviously are omitted.' "  Khamnei v. Burlington Pub. Works Comm'n, 2018 VT 19, ¶ 9, 206 Vt. 550, 183 A.3d 1157 (quoting 2A N. Singer & S. Singer, Sutherland Statutory Construction § 47:38 (7th ed. 2024)).  No such circumstances are present here.  As set forth above, imposing a four-attempt limitation on transferred scores, where Vermont has no ability to regulate how many times one sits for an examination in other states, serves the Court's "obligation to protect the public by ensuring professional competence."  Oden, 2018 VT 118, ¶ 10.[1]

---

[1]  The fact that applicant could seek admission under a different rule if she engaged in the active practice of law in Maine for a requisite period does not undermine this conclusion. Cf. post, ¶ 35; see also V.R.A.B. 14, 15.  Applicant also had the ability to request a second waiver from the Board under Rule 9 to sit for the UBE in Vermont but she did not pursue this approach.  The availability of different approaches, each of which have their own requirements, does not warrant reading a waiver provision into Rule 13.

8

¶ 19. Finally, we reject applicant's request that this Court waive Rule 13(c)'s requirement and direct that she be admitted. Applicant provides no compelling legal support for this argument, aside from citing the Court's control over disciplinary authority and its power to make, adopt, alter, or amend rules regulating the admission of attorneys. As set forth above, the Court has "established the Board of Bar Examiners to assess professional competence," and "committed to the Board the 'duty to determine whether each Applicant has made the necessary showing of Minimal Professional Competence in accordance with these rules warranting the Applicant's admission to the Bar to engage in the practice of law.' " Oden, 2018 VT 118, ¶ 3 (quoting V.R.A.B. 1, 3(b)). It would be inconsistent with the plain language of the rule and the process set forth in the Rules of Admission to the Bar to direct that she be admitted. We thus reject applicant's final argument.

Affirmed.

FOR THE COURT:

_____

Chief Justice

¶ 20. **JOHNSON, J. (Ret.), dissenting.** It is a rare case when this Court has the power to correct an injustice when there was no error of law at the lower tribunal, here the Board of Bar Examiners, but Samantha Granger's application for admission to the bar argues persuasively for us to do so. When an applicant asks us to consider whether a formalistic application of the rules of admission to her individual circumstances creates an unjust result, our "unique responsibility to regulate the practice of law within this state," In re Grundstein, 2018 VT 10, ¶ 23, 206 Vt. 575, 183 A.3d 57, is not discharged by the majority's conclusion that those rules satisfy rational-basis review or by its suggestion that Ms. Granger engage with the Board's formal rulemaking process. I believe this case demands a more searching inquiry. For the reasons set forth below, I would

9

hold that Rule 13(c), which is standing in the way of Ms. Granger's admission, is waivable for good cause shown and remand for the Board to consider whether she has demonstrated the requisite measure of professional competence—notwithstanding that she achieved the required Uniform Bar Examination (UBE) score on her sixth, rather than her fourth, attempt.

¶ 21.    The Vermont Constitution vests this Court with plenary authority to regulate the admission of attorneys to the state bar.  In re Birt, 2020 VT 55, ¶ 5, 212 Vt. 500, 237 A.3d 1263 (citing Vt. Const. ch. II, § 30).  In doing so, we have determined that "[t]he public interest is best served and protected and the integrity of the Bar of the Vermont Supreme Court is best maintained when applicants for admission are fairly, impartially, and thoroughly examined as to their professional competence as attorneys."  V.R.A.B. 1.  As a means to that end, we promulgated the rules "to ensure that attorneys granted admission to practice law in Vermont meet our standards for professional competence," and we established the Board to assess whether each applicant has made the necessary showing of competence in accordance with the rules.  In re Oden, 2018 VT 118, ¶¶ 3-4, 208 Vt. 642, 202 A.3d 252; see V.R.A.B. 1.

¶ 22.    This constitutional and regulatory framework necessarily "informs our standard of review" on appeal from the Board's determination that an applicant has not demonstrated the professional competence necessary for admission to the Vermont bar.  In re Grundstein, 2020 VT 102, ¶ 6, 213 Vt. 528, 251 A.3d 30; V.R.A.B. 25 (providing that individual may appeal Board decision to this Court "as a matter of original jurisdiction").  As we have repeatedly emphasized, the Board is an " 'arm of this Court' " and though we give "careful consideration" to its conclusions, "we are not bound by them."  Grundstein, 2020 VT 102, ¶¶ 6, 17 (quoting Widschwenter v. Bd. of Bar Exam'rs, 151 Vt. 218, 218, 559 A.2d 674, 675 (1989)).  Nor, as we recognized in Sarazin v. Vermont Board of Bar Examiners, are we constrained to rote application of "bright-line" rules governing admission when doing so would lead to unreasonable or unfair results.  161 Vt. 364, 367, 639 A.2d 71, 72 (1994).  Though such a rule may be consistent with

constitutional requirements and serve a salutary purpose in the vast majority of applications, "case-by-case determinations" may nonetheless "be necessary to assure fair treatment of applicants who present unusual or extraordinary circumstances." Id.  In those rare instances, and notwithstanding plain language to the contrary, we may construe a bright-line admission rule as waivable if doing so is essential to a fair and thorough examination of an applicant's professional competence.  Id.; see V.R.A.B. 1.

¶ 23.   This is precisely the relief Ms. Granger requested with respect to Rule 13(c).  In response to her thorough analysis of the many considerations bearing on this question, however, the majority simply summarizes cases holding that similar restrictions survive rational-basis review under the U.S. Constitution and, "[i]n light of this . . . reject[s] the suggestion that Rule 13's strict limitation on attempts to take the UBE is contrary to public policy."  Ante, ¶¶ 10-11 (citing Jones v. Bd. of Comm'rs of Ala. State Bar, 737 F.2d 996, 999-1102 (11th Cir. 1984); Poats v. Givan, 651 F.2d 495, 497-99 (7th Cir. 1981) (per curiam); Younger v. Colo. State Bd. of Law Exam'rs, 625 F.2d 372, 377 (10th Cir. 1980)).  I agree that Rule 13(c) survives rational-basis review.   See Grundstein, 2020 VT 102, ¶ 12 ("A state may require 'high standards of qualification . . . before it admits an applicant to the bar,' so long as any such requirement has 'a rational connection with the applicant's fitness or capacity to practice law.' " (quoting Schware v. Bd. of Bar Exam'rs of N.M., 353 U.S. 232, 239 (1957)).  But this is not the question posed by Ms. Granger's appeal.  As a result, I believe the majority's analysis terminates precisely where it ought to have begun.

¶ 24.   In Jones, Poats, Younger, and other cases raising constitutional challenges to state bar-admission rules, federal courts have carefully constrained the scope of their review in recognition of "the importance of leaving States free to select their own bars." Konigsberg v. State Bar of Cal., 353 U.S. 252, 273 (1957); see Theard v. United States, 354 U.S. 278, 280 (1957) ("It is not for this Court, except within the narrow limits for review open to this Court . . . to sit in

11

judgment on Louisiana disbarments" (citations omitted)).  As a concurring Justice explained in Schware, control over "[a]dmission to practice in a State and before its courts necessarily belongs to that State," and federal courts studiously avoid "act[ing] as overseer of a particular result of the procedure established by a particular State for admission to its bar."  353 U.S. 232, 248 (1957) (Frankfurter, J., concurring) (observing that "legislation laying down general conditions of an arbitrary or discriminatory character may, like other legislation, fall afoul of the Fourteenth Amendment" but "[a] very different question is presented when this Court is asked to review the exercise of judgment in refusing admission to the bar in an individual case").

¶ 25.   Thus, federal courts have held that "while concededly an applicant may eventually become minimally qualified after several periods of preparing for and taking successive bar examinations, a state is constitutionally able to require a somewhat more stringent standard for those who continue to fail after multiple attempts."  Poats, 651 F.2d at 499.  That we are "constitutionally able" to impose a bright-line rule requiring that a transferred UBE score be achieved in no more than four attempts has no bearing on our independent obligation to determine whether the same rule should be waivable as a matter of public policy.  Id.  After considering how Rule 13(c) operates in this case, I cannot discern any public interest served by denying Ms. Granger an opportunity to demonstrate that she is competent to practice in Vermont solely because she did not obtain a UBE score of 270 within her first four attempts.

¶ 26.   Under the rules, an applicant bears "the burden of establishing Minimal Professional Competence," a standard that "includes, but is not limited to: (1) knowledge of the statutory and common law; (2) capacity to analyze factual situations and apply principles of law to them; and (3) facility for written expression."  V.R.A.B. 2(g) (emphasis added), 5(b).  An applicant may meet this burden "either by satisfying the requirements for admission by examination, for admission by transferred [UBE] score, or for admission without examination."

V.R.A.B. 5(b). Where, as here, an applicant seeks admission by transferred UBE score, she must have achieved a qualifying score within no more than four sittings for the UBE. V.R.A.B. 13(c).

¶ 27. The UBE is comprised of the multistate bar examination (MBE), the multistate essay examination (MEE), and two multistate performance test (MPT) tasks. V.R.A.B. 2(h), (i), (j), (o). The Board grades and assigns raw scores to the MEE and MPT, and the National Conference of Bar Examiners (NCBE) scores the MBE and "scales the raw scores on the MEE and MPT to the MBE" to calculate and certify an applicant's UBE score. V.R.A.B. 10(a), (b). The multiple-choice portion of the UBE—the MBE—is of the greatest consequence to an applicant's UBE score. V.R.A.B. 2(h), 10(a). It is weighted at 50%, while the MEE and MPT are respectively weighted at 30% and 20%. V.R.A.B. 10(a).

¶ 28. As written, Rule 13(c) essentially creates an irrebuttable presumption: an applicant who does not achieve an overall UBE score of 270 within four sittings lacks the professional competence required of successful applicants to the bar. V.R.A.B. 13(b), (c); see, e.g., Jones, 737 F.2d at 999 (explaining that in imposing five-attempt limitation on bar examination, Alabama "in effect adopts a rebuttable presumption of incompetence, affords applicants five opportunities to rebut the presumption by passing the bar examination, and then essentially adopts as fact as to those individuals who fail the examination five times what it formerly presumed, their incompetency to practice law"). But the means by which we assess professional competence have evolved drastically over time. They continue to shift under the weight of mounting concerns that tests that heavily weight an applicant's success on multiple-choice examinations fail to accurately capture the numerous skills and attributes that, taken together, comprise professional competence. Given this reality, I fail to see why Ms. Granger should not have the opportunity to rebut the presumption of incompetence that attached with her fourth unsuccessful attempt after achieving a passing score on her sixth attempt.

13

¶ 29. Early iterations of the bar exam "were brief, perfunctory, and oral." M. Markovic, Protecting the Guild or Protecting the Public? Bar Exams and the Diploma Privilege, 35 Geo. J. Legal Ethics 163, 164-65 (2022) (quotation omitted) (observing that "Abraham Lincoln once administered an Illinois candidate's bar exam while drawing a bath"). It has since evolved into an "hours-long, strictly-timed, intensive written examination[] on various legal topics . . . comprised of multiple-choice questions, prompts for essays, and/or similar assignments." In re Chavis, 306 A.3d 653, 676 (Md. 2023) (describing UBE). Some commentators suggest that the "[t]he prime impetus" for adoption of the multiple-choice format that prevails today "was the need to grade quickly the increasing number of students taking bar exams." J. Grisé, Question #1: Is There a Gender Gap in Performance on Multiple Choice Exams? A. Always B. Never C. Most of the Time, 43 Women's Rts. L. Rep. 140, 151 (2021); see also Markovic, supra, at 173 (opining that history of bar examination is "relevant because there is scant evidence that the bar exam was ever intended as a test of 'minimal competence' ").

¶ 30. Confidence in the UBE specifically, and multiple-choice examinations generally, as a determinative measure of attorney competence has been seriously eroded in recent years. See R. Jarvis, An Anecdotal History of the Bar Exam, 9 Geo. J. Legal Ethics 359, 387 (1996) ("It generally is agreed that there is no correlation between how a person does on the bar exam and how he or she will fare in practice. As is often pointed out, Charles Evans Hughes, who . . . served as Chief Justice of the U.S. Supreme Court from 1930 to 1941, failed the New York State bar exam seven times."); G. Rosin, Unpacking the Bar: Of Cut Scores and Competence, 32 J. Legal Pro. 67, 68 (2008) (observing that "[i]f the states are laboratories of federalism, then the bar exam is the crucible states use as they experiment with concepts of minimal competence," but noting this experimentation "has not yet led to a consensus on the elements of minimum competence to practice law or of how to measure such elements"). In the years following the adoption of the MBE, one jurist forcefully stated:

14

These tests try to pigeonhole the law. Yes, put it in little egg-shaped ovals (witness MBE . . . answer sheets). It does not sell with me. The practice of law is heart and soul, learn through experience, study and reason, test and weigh, absorb the facts, recognize legal principles, conceptualize, balance, reason, formulate pleadings, write briefs, work hard, be honest, pay your bills, give your word to a fellow attorney and keep it, respect the courts, and above all, to help people. You cannot put that in little egg-shaped ovals. Competence to practice law cannot be measured by little ovals. . . . . Memory is not knowledge. Memory is the power of recall or recollection and may be employed as a device to reason. The law is vast—like an ocean—we bob on it like corks; our minds are so small and the law so vast.

In re Voorhees, 403 N.W.2d 738, 741-42 (S.D. 1987) (Henderson, J., concurring in part and dissenting in part) (observing that multiple-choice tests "restrict[]" an examinee "to an answer which is supposedly 'absolute,' " and force him to "attempt[] to guess correctly if he is unsure about various shades of correct answers").

¶ 31. Consonant with these shifting views, in January 2024, this Court voted to adopt the NCBE's NextGen bar exam in place of the UBE beginning in July 2027. Vt. Judiciary, Admission to the Vermont Bar, https://www.vermontjudiciary.org/attorneys/admission-vermont-bar [https://perma.cc/N83L-L9SA]. The NCBE explains that the NextGen exam—as its name suggests—"reflects a fundamental shift" away from the UBE approach and toward an integrated exam permitting the "use of scenarios . . . representative of real-world types of legal problems that newly licensed lawyers encounter in practice" to provide "an authentic assessment of lawyering skills." Nat'l Conf. of Bar Exam'rs, Overview of Recommendations for the Next Generation of the Bar Exam 2, 3 (2021), https://nextgenbarexam.ncbex.org/wp-content/uploads/TTF-Next-Gen-Bar-Exam-Recommendations.pdf [https://perma.cc/7N4Z-ML2C] (explaining that NexGen exam is predicated on "a three-year, comprehensive, empirical study" designed "to ensure that the bar examination continues to assess the minimum competencies required of newly licensed lawyers in an evolving legal profession, and to determine how those competencies should be assessed"). This alone suggests our acknowledgement that the UBE—whether passed on the first attempt or the

15

sixth—is not necessarily a dispositive measure of competence. Again, this is not to say that failure to achieve a score of 270 within four UBE sittings will not, in many cases, be indicative of a lack of professional competence. But the quantity and variety of criticisms levied at this mode of assessment—traced in only the broadest detail above—illustrate serious and widespread reservations about whether it is necessarily <u>determinative</u> of a lack of professional competence.

¶ 32. The materials Ms. Granger offered in support of her showing of competence demonstrate that this is precisely the type of "extraordinary" case that requires a more individualized assessment before we can be assured of a fair result. <u>Sarazin</u>, 161 Vt. at 367, 639 A.2d at 72. She candidly described the personal circumstances that led her to sit for the bar exam six times before obtaining a score of 270.[2] These included, but were not limited to, severe testing anxiety, her financial circumstances and corresponding need to devote time that others may have dedicated to bar preparation to earning an income, the impact of the COVID-19 pandemic on two of her examinations, and the birth of her first child. She described her work in the legal field during the period in which she sat for the bar, including her successful completion of a judicial clerkship, service as a deputy magistrate in the state of Alaska, and continuing role at a Vermont law firm where she manages a caseload of residential and commercial real-estate transactions under the supervision of attorneys licensed in Vermont. Ms. Granger also offered letters of endorsement and sixteen affidavits in which various individuals described her competence and readiness to practice law in Vermont. Attorneys who have worked with Ms. Granger attested to her "deep legal acumen," "ability to articulate complex legal concepts in a clear and concise manner," and demonstrated capability to "provid[e] outstanding representation to clients." The judge for whom Ms. Granger clerked opined that she "represents the very best of whatever one

---

[2] Notably, in each of the three attempts directly preceding her final success, Ms. Granger received scores of 265—only five points shy of the cutoff score in Vermont. V.R.A.B. 13(b).

could look for in a future lawyer, a judgment I can fairly make after . . . practicing law for over 29 years."

¶ 33.    In the face of this record, I am unpersuaded by the majority's efforts to distinguish Sarazin.  We recognized an implied waiver in that case because we concluded that the "bright-line" test "would preclude [the applicant] from qualifying for a four-year clerkship when, all other things being equal, the only difference in her situation from that of other four-year clerks" was that she was supervised by a Vermont attorney whose office was located just across the New Hampshire border, and "the quality of the supervision provided by a law firm is not necessarily a function of its geographic location."  Sarazin, 161 Vt. at 367, 639 A.2d at 72 (emphasis added).  Because we concluded that the application of a bright-line rule in these "extraordinary circumstances" would lead to unreasonable results, we exercised our authority to allow the Board to waive the rule for good cause shown.  Parks v. Bd. of Bar Exam'rs, 2005 VT 66, ¶ 7, 178 Vt. 599, 878 A.2d 297 (mem.) (citing Sarazin, 161 Vt. at 367, 639 A.2d at 72).  As a result, we expressly declined to reach the applicant's constitutional challenges to the same rule.  Sarazin, 161 Vt. at 366-67, 639 A.2d at 72 ("Since we hold that the § 6(g)(1) in-state provision is waivable, we do not reach the constitutional issues.").

¶ 34.    Here, the majority summarily holds that the type of "extraordinary circumstances" that compelled us to exercise our authority to waive an admission rule in Sarazin are not present. It rejects Ms. Granger's assertion that her professional capability is not significantly distinguishable from that of an applicant who seeks to transfer a passing score obtained in one of her first four attempts.  Ante, ¶ 15.  In support of this conclusion, it simply reiterates that the four-attempt limit contemplated by Rule 13's plain language is rationally connected to ensuring competence.  Id.  This has no bearing on the question Ms. Granger posed under Sarazin, a case in which we implied a waiver provision without ever considering whether the rule at issue survived rational-basis review.  Ms. Granger asks whether a bright-line application of Rule 13(c)—

17

regardless of its utility in the majority of cases—leads to an unfair result in her unique circumstances. I believe that it does. It is not a "foregone conclusion" that an applicant who achieves a score of 270 on her fourth UBE sitting is competent while an applicant who receives the same score on her sixth sitting is incompetent. See Sarazin, 161 Vt. at 367, 639 A.2d at 72. In my view, there is even less justification for drawing a bright line between two such applicants than there was for measuring the quality of supervision a Vermont attorney can provide a clerkship applicant by considering where that attorney's office is located relative to the Vermont border. Id. at 366, 639 A.2d at 72 (recognizing the Board's argument that "the need for oversight and supervisory efficiency" supported in-state requirement but nonetheless concluding requirement was waivable). A strict application of Rule 13(c) excludes Ms. Granger from our state bar even though she has presented us with far more information about her competence than can be obtained from a bare passing score of 270 on a fourth attempt at the bar examination. This elevates form over function. It is not a fair result.

¶ 35. In reaching our conclusion in Sarazin, we found it significant that the rules required attorneys seeking admission on motion from another jurisdiction to clerk with "an attorney practicing in this state," imposing no restrictions on the location of that attorney's office. 161 Vt. at 72-73, 639 A.2d at 367-68. A comparable consideration is in play here. Because Ms. Granger has been admitted to the Maine bar, she will become eligible to seek admission to the Vermont bar without examination in 2026, when five years have elapsed since she last received a score of less than 270 on the UBE. See V.R.A.B. 14 ("An Attorney-Applicant is not eligible to seek admission under this rule if [the applicant] has failed the Vermont Bar Examination within the preceding 5 years or failed to earn a score of 270 or higher on the [UBE] taken in Vermont or another UBE jurisdiction within the preceding 5 years."). In this way, the rules necessarily recognize that while prior UBE failures may be relevant to professional competence, they are not determinative of lack of professional competence where other considerations suggest a different conclusion.

¶ 36. Ms. Granger does not ask that we waive our cut-score requirement or suggest that a waiver should be implied in that rule. She merely seeks—upon having received a qualifying score—an opportunity to attempt to rebut the presumption of lack of competence to practice law in Vermont that attached upon her fourth unsuccessful sitting for the UBE. I cannot accept that the number of attempts required to achieve a passing score on the UBE is so inextricably intertwined with competence that we can satisfy our own commitment to "fairly, impartially, and thoroughly" consider all applicants by this measure alone. V.R.A.B. 1. Our own expressed public policy demands more than a bright-line rule. I believe this case presents the "extraordinary circumstance[]" in which we must exercise our plenary authority to allow the Board to consider waiver of an admission rule. Parks, 2005 VT 66, ¶ 7 (citing Sarazin, 161 Vt. at 367, 639 A.2d at 72). I would remand for that purpose. Therefore, I respectfully dissent.

Associate Justice (Ret.), Specially Assigned